## No. 12,327.

### IVES v. THE PEOPLE.

Decided June 3, 1929. Rehearing denied June 17, 1929.

Mr. Elson H. Whitney, Mr. Clee E. Hickman, for plaintiff in error.

Mr. Robert E. Winbourn, Attorney General, Mr. E. J. Plunkett, Assistant, for the people.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

Edward Ives, alias Eddie Ives, plaintiff in error, hereinafter referred to as defendant, was charged with the crime of murder of the first degree and upon trial was found guilty as charged, the jury fixing the penalty at death. Judgment was pronounced in accordance with the verdict. To review that judgment, this writ is prosecuted.

There are three assignments of error: (1) That the evidence was circumstantial, and therefore, under our statute, the death penalty could not be fixed; (2) that the evidence was insufficient to support the verdict; and (3) that the motion for a new trial, on the ground of newly discovered evidence, should have been granted.

The facts proven at the trial disclose that the defendant is a white man of the age of 44 years; that he has been confined in penal institutions five times prior to this trouble; that in 1916, while an inmate of the Colorado State Penitentiary at Canon City, he became acquainted with a negro named Hill, who was also an inmate of that institution; that Hill had been convicted several times for serious law violations, some of which involved the use of firearms; that Hill came to Denver on the evening of November 21, 1928, having been just previously employed by the Union Pacific Railroad Company as a laborer; that when Hill arrived in Denver he accidently met the defendant; that he and the defendant spent some time together drinking intoxicating liquors; that on November 22, 1928, the defendant and Hill were together, and, during the early evening, at the defendant's house had procured the .45 automatic pistol afterwards used in the murder of Officer Ohle at 2333 Curtis street in the city of Denver; that later in the evening the defendant and Hill were walking about Denver, endeavoring to locate a place they could rob and thereby secure money with which to buy liquor; that after considerable traveling, it was decided that they should rob a drug store on Champa street; that they entered the drug store and robbed it, the defendant holding the gun on the proprietor and his wife; that immediately after the robbery the defendant and Hill went to a house occupied by a Mrs. Reese; that this house was one in which liquor laws were violated, and where assignation was practiced; that it was a rendezvous for the lowest type of the negro race; that Hill had spent the previous night there with some prostitute, and was slightly acquainted

with Mrs. Reese; that Mrs. Reese permitted Hill to
bring the defendant into her house, and immediately pro-
cured liquor for them; that there were other negroes
there at the time the defendant and Hill arrived, and
these joined the defendant and Hill in their drinking;
that the defendant, at the time he entered the Reese
house, was carrying the automatic pistol with which
officer Ohle was shot, and for whose murder the defend-
ant was tried; that after the "party" at Mrs. Reese's
house had continued for an hour and a half, the par-
ticipants were alarmed by the announcement that offi-
cers were raiding the place; that all of the members of
the "party" sought a place of concealment; that short-
ly officer Ohle came into the dining room, where the
"party" had been in progress, and began to look for
and find the participants, and to line them up in the din-
ing room; that in his search for those concealed in the
house, he found one Mosley in the bedroom just off the
dining room, and brought him into the dining room; that
officer Ohle, from his conduct and utterances, assumed
that some one was in the bedroom under the bed, and
he accordingly ordered that person to come out, but his
order was not obeyed; that he reentered the bedroom,
stooped to look under the bed and was shot, and, as a
result thereof, died almost instantly; that when the
shooting began, a brother officer named Evans came
upon the scene, was shot, and has since died, although
not as a direct result of the wound received at that time;
that Mrs. Reese, the proprietress of this dive, was also
shot, and died shortly as the result of her wound; that
immediately after the shooting the defendant and Hill
went to the home of the defendant's mother; that while
on their way there, they encountered a Mexican whom
they proceeded to "hold up," and again the defendant
was the one who held the gun and used it unnecessarily
in assaulting the Mexican; that the defendant was ar-
rested in the early morning of November 23, 1928, at his
mother's home, and under his pillow was found loaded

the automatic pistol which was used in the murder of officer Ohle. This much of the evidence is not contradicted.

The people contended that the murder of officer Ohle was committed by the defendant, and the jury which tried the case must have believed the people's witnesses in order to have returned the verdict which it did.

Those of the people's witnesses who testified as to the whereabouts of the defendant during the shooting, placed him in the bedroom from which the shots were fired that killed officer Ohle. Some of these witnesses testified positively that the defendant was under the bed; others that he entered the bedroom; and others testified that they saw him coming from the bedroom brandishing an automatic pistol. All of those who testified credit the defendant with remarks that clearly indicate he was the one who fired the shots, but none testified that he actually saw the defendant pull the trigger or hold the gun while shooting.

The defendant denies that he fired the shots that killed the officer, but says that when he and Hill entered Mrs. Reese's house he had the pistol; that after they had been there some time, Hill "kicked" him under the table, and bending over, whispered for the defendant to hand him the pistol; that he complied, and from that time on, and during the raid at which the shooting occurred, the pistol was in the possession of Hill, and that he, the defendant, was unarmed. The defendant also testified that he did not enter the bedroom; that he was hiding behind some curtains in the dining room, and while the raid was in progress, and without seeing any officers, he walked down the hallway, through the front door, and to the sidewalk, and was outside when the shooting occurred; that Hill came out of the Reese house shortly after the shooting, and handed the pistol to the defendant; that it was hot and empty; that when the defendant arrived at his mother's home, he reloaded it and put it under his pillow.

1. The first assignment is that the evidence upon which this defendant was convicted is entirely circumstantial, and therefore, the death penalty could not be fixed. Section 6665, C. L. 1921, so far as pertinent to this question, reads as follows: "6665. * * * Provided, That no person shall suffer the death penalty * * * who shall have been convicted on circumstantial evidence alone."

It therefore becomes necessary for us to determine whether or not the defendant was convicted on "circumstantial evidence alone," and for this purpose, we shall quote from the testimony of those witnesses who were actually present at, or just before, the shooting.

Della Smith, a roomer at the Reese house, testified in part:

"Q. Where were you living on the night of November 22nd, 1928? A. 2333 Curtis street.

"Q. Did you see the defendant, Eddie Ives, there on that night? A. Yes, sir.

"Q. Were you there at the time the officers came in? A. Yes, sir.

"Q. Go ahead now and tell just what happened when the officers came in. A. Well, when the officers came in we all broke to run, so, Mr. Mosley, he and myself, and Henry Hill and the defendant Eddie Ives and Arthur Mosley, we were all in a row, and another white fellow, I didn't know his name—

"Q. (interrupting) There was—now, let us see, it was after Ohle came in you all broke to run? A. Yes, sir, we did, Eddie Ives run in the bedroom off the dining room.

"Q. That is in this bedroom (indicating)? A. Yes, sir.

"Q. Now, did you see where he went in that bedroom? A. Under the bed.

"Q. You saw him crawl under the bed? A. Yes, sir.

"Q. Now, where did you go? A. I run in the bedroom off the kitchen.

"Q. And did you go back in the dining room later on? A. Later on, after the shooting was over.

"Q. Well, did you go back in the dining room after you had first run when the officers came in? A. Oh, when he lined us up, I did not go to the bedroom when he first came in.

"Q. And what did he (Ohle) do with you? A. He lined us all up in a row.

"Q. Where was that? A. In the dining room.

"Q. Now, who else was in the dining room with you? A. Arthur Mosley, Hill and myself and another white fellow.

"Q. Was this white man Eddie Ives? A. No, sir.

"Q. Now, what happened after that? A. Mr. Ohle went in the bedroom off the dining room.

"Q. Did you hear him say anything? A. Yes, he told Ives to come out from under the bed, don't he think he could see him.

"Q. And what occurred? A. Well, I started towards the kitchen again to hide, and I heard the shooting, * * * ."

On cross-examination, the same witness testified:

"Q. You did observe that Eddie Ives went into the bedroom adjoining the dining room? A. Yes, sir.

"Q. Did you see him crawl under the bed? A. Yes, sir.

"Q. Did you go into the bedroom to watch him crawl under the bed? A. No, sir.

"Q. How do you know he crawled under the bed? A. Well, you can see right from the dining room through the door, it is only a small room."

Henry Hill, the ex-convict, and the one whom the defense contends fired the fatal shot, testified:

"Q. Now after the officers came in what occurred? A. Well, he says, 'Line up,' and I jumped up and got against the wall, and there was some woman I never

148

looked around to see what woman it was, she was standing to the side of me, and the officer says, 'Come out from under that bed,' and this woman says, 'There ain't anyone under the bed.' He says, 'Do you think I am a damn fool?' he says, 'You had better come out from under that bed.'

"Q. Now, where was the bedroom? A. Right directly in front of me."

He testified that he was looking towards the bedroom; that the door stood open, and that he could see into it by the light from the dining room; that he saw officer Ohle enter the bedroom, stoop over to look under the bed, and then the gun-fire.

"Q. Could you see any flash? A. I could.

"Q. What did you do when the first shots were fired? A. When the first shots were fired I could not do anything, I stood there until it looked like I would get hurt, and run into the kitchen, and then run back, Ives was standing at the door, (bedroom) brandishing the pistol this way (indicating), and says, 'I have killed three, I want to kill some more,' and I says, 'For Christ sake don't kill me,' and I rushed right on and run into the kitchen, and run out to the front door, run out to the sidewalk."

Arthur Mosley, a frequenter of the Reese house, testified that when the officers arrived he and the defendant went into the bedroom where officer Ohle was subsequently killed; that he and the defendant made a futile attempt to escape through a window; that when officer Ohle first entered the bedroom he found Mosley on the bed, and took him into the dining room. The officer then reentered the bedroom to apprehend the person under the bed and was shot. He further testified, on cross-examination:

"Q. And Eddie Ives followed you in there, did he? A. Yes.

"Q. Where did he go? A. I don't know, I looked back and saw him behind me. * * *."

John Morrissey, who admitted that he was the bootlegger who supplied the liquor for the "party" at Mrs. Reese's house that evening, and who also admitted that he had been supplying this place with at least a gallon of liquor daily for more than six months, testified that he was present at the time of the shooting, having arrived shortly prior thereto to deliver a second gallon of liquor; that just as he was delivering the liquor the officers arrived. He testified:

"Q. What did Ohle do with you? A. He set me down on a little daveno.

"Q. Could you see into the bedroom from where you were sitting? A. Not very well, because the door was not kept open far enough.

"Q. Did officer Ohle go into that bedroom? A. Yes, sir.

"Q. Did you see him bring anyone out from there? A. He brought Mosley out.

"Q. All right, then what did Ohle do? A. Ohle says, 'Some one else is under the bed,' he says, 'Come on out,' and Della Smith says, 'Why, there ain't any use making such a big noise, officer,' she says, 'that fellow will come on out.' 'Well,' he says, 'come on out, get going' and I did not see nobody get out, so he went back in there.

"Q. And then you said —go ahead. A. And I seen Ives come out of the room swinging a .45, he was talking about something, I could not catch it, * * * and he says, 'Boy, I killed two coppers, * * *.'"

The witness Morrissey fled from the Reese house, through the yard to the alley, then came to the front of the house, and there saw Hill and the defendant leave by the front door, Hill being in the lead. He identified the gun, which was found under the defendant's pillow at his mother's home, as the gun which the defendant was "swinging" when he came from the bedroom in which the officer was shot.

Clarence Trigg, an ex-convict, who, at the time of the

murder, was a cook employed by Mrs. Reese and residing in her house, testified that the defendant and Hill were both in the house the evening of the killing; that at the time of the shooting, he was in his own bedroom, adjoining the bedroom in which the murder occurred; that he did not see the defendant enter the bedroom, but, when the shots had ceased, he peered out of his own bedroom door and saw the defendant. His testimony regarding this is:

"Q. You stepped to the door and opened it into the hallway? A. Yes, sir.

"Q. After that did you see the defendant? A. Just as I opened it I saw him walking up the hall.

"Q. What did he have? A. He had a pistol in his hand.

"Q. What did he do or say? A. He just said, 'Don't anybody come out,' just like that."

The record discloses that the defendant, according to Hill, said: "I have killed three, I want to kill some more," and, "Get going, you black son of a bitch, I ought to bump you off, too," and, "By God, I have killed two policemen, I would like to kill some more." and, "Do you reckon Mother and them will tip me off?" Meaning Mrs. Reese.

■ We understand it is contended that inasmuch as no one saw the defendant point the gun at officer Ohle and pull the trigger discharging the shell that contained the bullet which killed him, that the evidence respecting the defendant's participation in the shooting is circumstantial. With this contention we cannot agree. When a shot is fired and immediately thereafter a person falls, mortally wounded, and upon his body is found evidence of the fact that his death was caused by a bullet, we are forced to conclude that the shot came from the gun which was fired.

According to the evidence of the people's witnesses who testified respecting the fact, the defendant had the .45 automatic in his possession just prior to, at the time,

and immediately after the shooting. The officer was killed with a .45. Every witness who testified accounts for the whereabouts of all the parties named as participating in the "party" that night. Some positively testified that the defendant was in the bedroom, and one, at least, that she saw him under the bed. There were only two persons who went into that bedroom after the arrival of the officers. One, Mosley, was brought out by officer Ohle, the other, the defendant, remained there until after the shooting, and was identified as the one who came from the room brandishing the pistol.

If we use the natural senses with which the Creator has endowed us, it is asking too much to expect that we will indulge in such technicalities and distinctions as to say that this is circumstantial evidence. If this be circumstantal evidence, so would be the testimony of a witness who stated that he saw a man point a gun at another, heard an explosion therefrom and saw the victim drop. We do not believe it reasonable that the rule of direct evidence should be, or is, so circumscribed as to require, in order to sustain a death sentence in such a case, that a witness testify not only to the foregoing, but also that he saw the bullet leave the gun and penetrate the body of its target.

In *Covington v. People,* 36 Colo. 183, 190, 85 Pac. 832, a contention somewhat similar to the one urged herein was made, and Mr. Justice Goddard therein characterized the evidence as direct, as contradistinguished from circumstantial, saying:

"Error is assigned upon the giving of the instructions Nos. 2 and 5, because therein the jury are told that the death penalty might be inflicted in contravention of section 1176, Session Laws 1901, page 153, which provides inter alia, 'Nor shall any person suffer the death penalty who shall be convicted upon circumstantial evidence alone.' It is insisted that there is no direct evidence as to the fact of the shooting, and that Terry's statement that defendant fired the shot is but an inference

based upon surrounding circumstances, and not upon actual observation, and is, therefore, to be regarded as circumstantial evidence within the meaning of the statute. While it is true that the witness testified that he turned and walked towards the deceased, he describes how the gun was fired, and how the gun was pointed. He stated that he didn't exactly have his back turned on defendant when he fired, and he then goes on to describe to the jury the position that he was in, and says: 'I was standing something like this, and he was right over there, and he had his gun on me like that'; that the bullet glanced his finger. In answer to the question, 'How were you standing at the time you received the shot?' he answered, 'Well, I was standing just about at the side, something like this, and he was standing over there, a straight shot'; that he was, 'sort of angling between the deceased and Covington.' Furthermore, Hopkins testifies that when Winnie Adams came in the door, she screamed that she was shot, and, when asked who shot her, she said Henry Covington.

"While it may be that Terry was not looking at Covington at the instant he fired the shot, yet the interval was so short between the time he saw him with his hand upon his gun and the time he heard the report and felt the effect of the bullet on his finger, and from the fact that he saw the position in which Covington held the gun immediately upon the shot being fired—in these circumstances, we think it can be said that the witness was cognizant through his senses of the fact that Covington fired the shot, and that his evidence as to that fact is not circumstantial within the contemplation of the statute."

█ It will be noted also that the witnesses Hill and Morrissey testified to statements of the defendant made immediately after the shooting had ceased. There were two officers shot, the proprietress was mortally wounded and there was the defendant, with the pistol in his hand, coming from the room in which the shots were fired. His

statements were made almost simultaneously with the shooting, while in the heat of passion, and when it looked as though he might escape from the clutches of the law. At this time, according to the testimony of the people's witnesses, none of them knew that Mrs. Reese was shot, and yet their evidence, if true, conclusively shows that the defendant knew the havoc he had wrought for he exclaimed, as he came from the room, "I have killed three, I want to kill some more," and then to Hill he said: "I ought to bump you off too, you are dangerous," and, "By God, I have killed two policemen, I would like to kill some more." The defendant, when he discovered the bootlegger Morrissey, just after coming from the room in which the fatal shots were fired, said, as testified to by Morrissey, "There is another one of them sons of bitches," and shot at Morrissey who fled to the kitchen and hid there, and when the defendant followed him into the kitchen he said: "Boy, I killed two coppers."

The defendant attempts to strengthen his position, on the character of this evidence, by our decision in the case of *Mitchell v. People,* 76 Colo. 346, 232 Pac. 685, but we find nothing therein to support him in the contention that the evidence in this case is circumstantial. In the Mitchell case, supra, Mr. Justice Burke, writing the opinion for the court, says (page 349): "It is further observed therein that any confession, once clearly established, is inherently the strongest, not the weakest, evidence of the facts it details; and the weakness of an oral confession is not in the confession itself, but in the evidence of its existence."

In *Damas v. People,* 62 Colo. 418, 163 Pac. 289, the defendant was charged with, and convicted of, murder of the first degree, with the death penalty fixed. This court reversed the judgment. We held that the evidence, being an oral confession, was circumstantial. But the Damas case, supra, was expressly overruled by the judgment in the Mitchell case, supra. In the Damas

154

case, a dissenting opinion was rendered by Mr. Justice Gabbert, Mr. Justice Garrigues concurring, in which the only basis for the dissent was the holding that an oral confession was circumstantial evidence. The dissenting opinion announces a correct principle of law in this jurisdiction. In it, Mr. Justice Gabbert has the following to say with reference to oral confessions:

"The reversal is based solely upon the ground that the confession by the defendant, as detailed by a witness for the state, was circumstantial evidence. With the utmost deference to the writer of the majority opinion, and my associates who concur, I dissent from this view.

"In my judgment not an authority is, or can be, cited, which supports it. True an extrajudicial confession, is to be received with caution, because it may not be correctly stated by the witness or never made, but these considerations merely affect the credibility of the witness testifying to the confession, and cannot by any line of reasoning cause it to be classed as circumstantial evidence; nor because it should be cautiously received and carefully weighed, that it was the purpose of the statute to so class it. Words employed in a statute are to be given their ordinary meaning, and when these are plain, it must be carried into effect according to its language. * * * Not so with a confession. It is evidence which speaks for itself and not by inference from other facts, but directly on the facts it details. The authorities universally hold, that when extrajudicial confessions are voluntarily and deliberately made, they are entitled to the highest credit. A material issue was whether the defendant killed the person he was charged with having murdered. What testimony could have been more direct than the confession that he did? It was as direct and positive as though a witness had testified he saw him fire the fatal shot. But it is not necessary to further discuss the question upon which the decision is based. There are many cases which hold, where the point was directly involved, that a confession is not circumstantial

evidence but direct, among which we cite:" Citing cases.

■ It is said: "A confession is defined to be the voluntary admission or declaration made by a person who has committed a crime or misdemeanor, to another, of the agency or participation he had in the same." 1 R. C. L. page 550, §99.

■ We have held that a confession, either written or oral, is direct evidence as contradistinguished from circumstantial. The language used by the defendant at the time of the commission of the crime, as testified to by witnesses, is sufficient to make it a confession within the purview of the definition.

■ We are not limited, however, to the confession in this matter for, in addition to it, there is evidence which is direct. We believe the testimony of the witnesses Hill and Morrissey is direct evidence of the commission of this crime by the defendant. Under the rule laid down in the case of *Covington v. People,* 36 Colo. 183, 85 Pac. 832, it is not necessary for the people to produce witnesses who actually saw the defendant pull the trigger before one can be convicted of murder of the first degree, with the death penalty fixed. The evidence in this case is such as to convince us as men, and it must suffice to convince us as judicial officers.

■ 2. What has been said in the discussion of the foregoing assignment must be considered in our determination of the second assignment; i. e., the insufficiency of the evidence.

The evidence in this case is not only sufficient to convince beyond a reasonable doubt, but it actually convinces beyond every doubt. We believe that the jurors would have merited the severest criticism had they failed, on such clear and convincing evidence, to return the verdict which they did. The task this jury had to perform is the most trying in our entire system of law enforcement, but, by their verdict, we are convinced that

they performed their duty honorably and courageously, and with due and proper regard for their oaths.

3. The third and last assignment relates to the refusal of the court to grant the defendant a new trial on the ground of newly discovered evidence. The affidavit offered in support of this assignment is that of D. M. Roll, and it purports to contain statements which the affiant says Hill made while in the county jail. Hill pleaded guilty to aggravated robbery, committed when they robbed the drug store which he and the defendant entered just before they went to the Reese house. He was sentenced to the State Penitentiary at Canon City for the term of his natural life. It is proper for us to say that the D. M. Roll who makes the affidavit is, according to the records in this court and of which we take judicial notice, the same Roll whose conviction and sentence was approved by this court in 78 Colo. 589, 243 Pac. 641. His affidavit adds one more convict's testimony to a record already overburdened with testimony of this sort. Roll says, in his affidavit, that Hill stated to him: ''That he did not tell all the facts or all he knew on the witness stand; that if all the facts were known in the case they would be putting the rope around his neck instead of Eddie Ives''; that he had Ives' gun inside of the house just before the officers arrived; that he did the shooting and wished he had killed some more cops that night; that he went out the back door of the house and met Ives outside where he gave the gun back to Ives; that he himself was the man who was under the bed; * * *.''

It must be noted that there is no showing that Hill will testify, in the event of a new trial, differently from his testimony at the first trial, nor is there any attempt made to show that affiant would testify, if competent, in event of a new trial. Assuming that Hill made the statements credited to him by the Roll affidavit, then Hill has recanted, and has added perjury to his long list of felonies.

Mr. Justice Campbell, in commenting upon the granting or refusal of new trials on the ground of newly discovered evidence, said: "The general rule is that courts look with disfavor upon applications for a new trial upon the ground of newly discovered evidence. To look with favor upon them would bring about a looseness in practice, and encourage counsel to neglect to gather all available evidence for a first trial, and speculate upon the verdict, and if defeated, then to be diligent in securing other evidence to cure the defects or omissions in their showing at the first trial. Courts will see to it that there is not a miscarriage of justice and are sometimes indulgent in their requirements as to a showing of newly discovered evidence, if they are impressed with the conviction that there has been a miscarriage of justice, even if the newly discovered evidence be incidentally impeaching in its nature and merely cumulative, when satisfied that there is probable cause that the result would be different as the result of such testimony. We do not believe there has been a miscarriage of justice in this case, and due diligence was not shown." *Edwards v. People,* 73 Colo. 377, 394, 395, 215 Pac. 855.

Mr. Justice Whitford in *Blass v. People,* 79 Colo. 555, 557, 558, 247 Pac. 177, in passing upon the question of new trials upon newly discovered evidence, amounting to a recantation of a principal witness, and an acknowledgement of perjury by the witness, said:

"The question for our determination is whether a recantation by a witness who testified on behalf of the people necessarily required the trial court to grant the defendant a new trial. We must answer the question in the negative. Such a rule would imperil the proper administration of justice. *People v. Shilitano,* 218 N. Y. 161, 112 N. E. 733, L. R. A. 1916F, 1044. The power to grant a new trial to a convicted felon would no longer rest in the sound discretion of the court, but with the witness who testified against him upon the trial.

" 'It cannot be said that, as a matter of law, a new

trial should be granted whenever an important witness against the defendant shall make an affidavit that he committed perjury in his testimony. If that were so, justice would be defeated in many grave cases.' *People v. Tallmadge,* 114 Cal. 427, 46 Pac. 282.

" 'There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character.' *People v. Shilitano,* supra.

"We have many; times announced that motions for new trial, based upon the ground of newly discovered evidence, are to be regarded with disfavor. *Edwards v. People,* 73 Colo. 377, 394, 215 Pac. 855; *Eachus v. People,* 77 Colo. 445, 448, 236 Pac. 1009. The granting or refusing of such a motion rests within the sound discretion of the court. *Wiley v. People,* 71 Colo. 449, 207 Pac. 478; *Eachus v. People, supra.*"

There was no error in refusing to grant the motion for a new trial upon the ground of newly discovered evidence.

The record in this case convinces us that the defendant had a fair and impartial trial, and was justly convicted of the crime upon evidence proving his guilt beyond any doubt. His attorneys were appointed to defend in the trial court and in this court they have continued without remuneration. They have been assiduous and untiring in his behalf and have done everything humanly possible to see that their client had a fair and impartial hearing, and that he should not suffer the extreme penalty until every legal right had been exhausted.

We have not been technical in our consideration of the record in this case, and have given it painstaking study and careful and deliberate thought for the purpose of protecting the defendant, and fully discharging our duty in the premises.

The predicament in which the defendant finds him-

self is due entirely to his own deliberate wrongdoing, and for it he has no one except himself to blame. His life has been one of crime, and so long as one violates the law, he must expect the punishment. The law is that one who commits murder, as did the defendant herein, must suffer the death penalty, and so long as that law remains on our statute books, it must, and will be, enforced.

The judgment is accordingly affirmed, and it is further ordered that it be executed during the week commencing August 19, 1929.