No. 16,164.

DOWNEY *v.* THE PEOPLE.
(215 P. [2d] 892)

Decided February 20, 1950.   Rehearing denied March 13, 1950.

Messrs. LONG, HYMAN & CALKINS, for plaintiff in error.

Mr. JOHN W. METZGER, Attorney General, Mr. JOSEPH E. NEWMAN, Deputy, Mr. RAYMOND B. DANKS, Assistant, for the people.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the court.

DAVID ALBERT DOWNEY, the defendant in the lower court and to whom we hereinafter refer as defendant, or by name, was charged by information filed in the district court of El Paso county on July 28, 1947, with having "feloniously, wilfully and of his malice aforethought" killed and murdered one Lolly Lila Downey. Defendant entered a plea of not guilty and the cause came on for trial October 7, 1947. The jury returned a verdict of guilty of murder in the first degree and fixed the penalty at "life imprisonment at hard labor in the State Penitentiary." Motion for new trial was thereafter filed, argued, and denied, and appropriate judgment was entered by the court. Defendant brings the cause here by writ of error, and relies for reversal upon alleged errors of the lower court in the conduct of the trial as follows: 1st. That the trial court erred in receiving in evidence testimony relating to an alleged confession made by the defendant and in refusing to strike said testimony. 2nd. The court erred in refusing to strike the testimony of Dr. Henry W. Maly as the same related to the injuries to the larynx of the deceased. 3rd. The court erred in overruling defendant's motion for a directed verdict upon the ground that the corpus delicti had not been established. 4th. That the court erred in refusing to give two instructions tendered by the defendant.

The evidence discloses that defendant met deceased in London, England, in 1943 while he was serving in the military forces of the United States. Deceased came to the United States in January, 1946, and in April of that

year she and defendant were married in the State of California. In May of 1946, a $10,000.00 endowment life insurance policy was issued upon the life of the deceased, and in August of that year two additional policies, each in the sum of $5,000.00, were issued upon her life. Defendant was named as beneficiary in all of these policies, which contained double indemnity provisions in case of violent death by accidental means. The defendant carried the same amount of insurance upon his own life and the beneficiary in those policies was the deceased.

It appears that for some months following the marriage defendant and his wife were employed, and that their joint earnings were $540.00 per month. In May, 1947, defendant and deceased went from California to Iowa, due to the illness of defendant's foster mother, where they remained until shortly prior to the events resulting in the death of Mrs. Downey. Defendant and deceased arrived in Colorado Springs, Colorado, on July 16, 1947, on their return trip to California. On July 17th they visited various points of interest. On July 18th they drove to the top of Pikes Peak, had lunch at Woodland Park, after which they drove up the Rampart Range road and did some climbing. At about one o'clock in the afternoon they proceeded by car to a still higher point on this road, where they again parked their car. From the point where their car was parked they climbed a hill. The body of Mrs. Downey was later found about one-third of the way up this hill.

Between one and two o'clock in the afternoon of July 18, 1947, a Dr. Wilson was driving on the Rampart Range road when he observed the defendant being assisted into a car by a Mr. Hubbard from Texas. Dr. Wilson stopped his automobile and noticed blood on the left side of defendant's shirt. He testified that defendant stated, "I am not hurt—that is my wife's blood. * * * She may be dead." Dr. Wilson and Mr. Hubbard were unable to find Mrs. Downey and returned to de-

fendant's automobile and he thereupon assisted them in locating the body. According to Dr. Wilson the body was not disarranged. It was placed out very carefully. Mrs. Downey was dead, but the body was warm. Defendant complained of injuries received from a fall, police authorities were notified, and defendant was taken to a hospital in Colorado Springs where he remained until Saturday, July 19, when he was lodged in the county jail. Dr. Wilson testified that while at the hospital defendant asked him, "if her tongue was out" and when the doctor asked the reason for the question defendant stated, "She seemed to be strangling and I tried to remove her tongue." The terrain where the body was found was rugged, being a mass of rocks and boulders. It was not, however, a dangerous area as to being precipitous. The body was lying at the foot of a ledge of rock about three feet in height, on the surface of which there was a considerable amount of blood. About thirty-four feet up the hill from the point where the body was found there was some evidence that a scuffle had occurred. An autopsy was performed which disclosed superficial scratches and bruises. There was a two inch wound in the back of the head which penetrated the scalp but did no further damage and was not the cause of death, which, as testified by the experts performing the autopsy, was asphyxia due to a strangulation.

I. B. Bruce, chief of police of the city of Colorado Springs, was called in by the sheriff of El Paso county to question the defendant. Bruce testified that he kept an accurate record of the time within which the questioning of defendant continued, and stated that on July 20, defendant was questioned a total of six hours and forty minutes, the time being as follows: 10:20 A.M. to 12:30 P.M.; 2:30 P.M. to 4:30 P.M.; 5:30 P.M. to 6:00 P.M.; 7:00 P.M. to 9:00 P.M.

On July 21, the questioning continued for five and

one-half hours, as follows: 10:30 A.M. to 12:00 noon; 2:30 P.M. to 4:30 P.M.; 7:00 P.M. to 9:00 P.M.

On July 22, defendant was taken by automobile from Colorado Springs to the scene of the alleged crime by undersheriff Clark to trace the path which he and his wife had followed. The trip consumed the hours between 9:00 A.M. and noon. Defendant was questioned while at the scene. On July 23 defendant was questioned before Chief of Police Bruce for six hours and forty-five minutes, as follows: 11:00 A.M. to 12:00 noon; 2:00 P.M. to 3:15 P.M.; 4:00 P.M. to 6:00 P.M.; 8:00 P.M. to 10:30 P.M. After 10:30 P.M., the evidence is that officer Clark talked with defendant for "an hour or so" A lie detector was used in the afternoon, to the use of which the record does not disclose any objection. On July 24th, in the forenoon, the Reverend Albertson, minister of the First Methodist Church at Colorado Springs, conferred with the defendant privately for about two hours. This conference was arranged at the request of defendant. Defendant was questioned by the officers at 1:00 P.M., who testified that he then stated, "that he had slept over it and wanted to get it off his chest and try to atone for the wrong he had done. He was an entirely different individual and talked freely." During the intervals separating the interrogations of defendant he was not disturbed; he was provided with food, and made no complaint of being denied opportunity to rest.

During the questioning of defendant prior to the afternoon of July 24, his statement—generally persisted in by him—concerning the events immediately preceding his wife's death was, as related by officer Bruce, as follows: "They drove back to Woodland Park at eleven o'clock A.M. where they had lunch and drove to the Rampart Range Road, stopping one place to climb around. They got back in the car and drove to another spot where Mrs. Downey met her death. They parked the car on the right-hand side of the road facing Colo-

rado Springs, climbed about three hundred yards from the highway up around a large rock and were sitting on this rock—not clear to the top—and were necking up there. In some manner Mrs. Downey fell—he doesn't know how she fell—she was injured, she screamed, he rushed after her. He thinks he picked her up. He got hold of her body. He didn't know she was injured but she was bleeding. He had her in his arms—both fell and after they both fell he is very, very hazy. He injured his back—just don't know what happened. From the time he fell—he remembers he was in the air—he don't remember anything until he was found down on the highway on all fours by a Mr. Hubbard who was driving by—a tourist from Texas. He assisted him to his car and about that time Dr. F. M. Wilson, a tourist from Leavenworth, Kansas, appeared on the scene and he told them both what happened and tried to direct them where they would find his wife. They left the highway but were unable to find her. They came back to the car and assisted Mr. Downey to where his wife was. He pointed her out and they took him back and sent him in an ambulance to Memorial Hospital of this city."

The alleged confession made by defendant on July 24th, following the visit of Reverend Albertson, was related by officer Bruce, while a witness, as follows: "They came back to Woodland Park where they had lunch at eleven A.M. After finishing lunch they drove on the Rampart Range Road, stopped and climbed around, got back in the car and looked for a place to climb that would not be too dangerous. They parked their car on the right-hand side of the road at a spot quite high and left the car and went from the car about three hundred yards around and up on these rocks and were sitting on the rock talking about their trip, the distances of the trip, about their apartment in San Francisco, and an argument came up. Downey flatly refused to tell me what the argument was about—he

said he did not want to blacken his wife's character. He said that ever since they had been married there had been a clash of personalities—she was European and he an American—she was European in habits and customs—she was a Leftist—not exactly a Communist—but she was very liberal and he was just the opposite, that he favored management as opposed to the masses. He said he should not have married her, that he didn't know her long enough, and said, 'If I had married an American girl—one who thought as I do, she would still be alive and it would be a happy marriage.' * * * Now, resuming the details of what happened on this mountain top; they were on this hill and had this argument and got ready to leave. His wife had picked up a rock for geological comparison and he picked one up. His wife was in the lead, he bringing up the rear. He doesn't know what happened—he completely lost his head. He took the rock, about the size of two teacups, and hit her in the back of the head. Whether that knocked her down or she fell he does not know. She was injured. He rushed to her and had her in his arms. He said he choked her to death with his left arm. After that he doesn't know for sure how he got down to the point that he was found stumbling and crawling around."

Defendant's counsel objected to the admission of the alleged confession of July 24th upon the ground that it was not made voluntarily, but was the result of police coercion, and upon the further ground that its admission in evidence amounted to a denial of due process of law in violation of the Fourteenth Amendment to the Constitution of the United States. The trial court, in the absence of the jury, heard evidence bearing upon all the pertinent circumstances under which the alleged confession was made, and overruled defendant's objection to the admission thereof in evidence. Defendant took the stand in his own behalf and admitted making the statement of July 24th, attributed to him by the officers. He denied

the truth of the statement and asserted that the alleged confession was made for the reason that, "For five days I had been questioned and accused and I wanted to tell them something that would make them leave me alone."

It is admitted that during the questioning which preceded the making of the alleged confession the chief of police told defendant that his story "stunk." It is further admitted that defendant was repeatedly told that he was a liar, that he was repeatedly accused of murdering his wife, of strangling her, of choking her, and of hitting her on the head with a rock. It also is admitted that on the night of July 23rd undersheriff Clark, in response to a question of defendant concerning how long the questioning might continue, stated that he had known people to be questioned a week or two weeks. Defendant told the court (in the absence of the jury) that he made the alleged confession because, "After six days of this interrogation, not eating or sleeping to amount to anything, I was so mentally and physically exhausted that I would say anything to end it—I couldn't take it any longer." Defendant further stated, concerning the whole investigation, that generally speaking the questioning was conducted in a "gentlemanly manner," and that his inability to eat and sleep was not caused by the failure to provide food or opportunity to sleep, but by the entire situation with which he was confronted. His testimony concerning the events resulting in the death of his wife was, on the whole, consistent with his first statement to the police.

The trial court instructed the jury in substance that the burden rested upon the people to prove that the alleged confession was voluntarily made by the defendant, and if the jury found from the evidence that it was not so made, it should be entirely disregarded as evidence.

### Questions to be Determined.

First: *Should this court hold as a matter of law that the alleged confession of defendant was involuntary, and*

*that the admission thereof in evidence amounted to a denial of due process of law in violation of the Fourteenth Amendment to the United States Constitution?*

In the light of recent decisions of the Supreme Court of the United States in *Watts v. State of Indiana,* 338 U. S. 49, 69 Sup. Ct. 1347; *Turner v. Commonwealth of Pennsylvania,* 338 U. S. 62, 69 Sup. Ct. 1352; and *Harris v. State of South Carolina,* 338 U. S. 68, 69 Sup. Ct. 1354, we have most carefully examined all the facts here present and compared them with the factual situations existing in those cases in an effort to correctly apply the law as announced by the highest judicial authority in this nation, and we have been greatly assisted by able briefs and arguments presented by counsel for the defendant, as well as those filed on behalf of the people. In *Watts v. State of Indiana, supra,* the Supreme Court of the United States, among other things, said:

"A confession by which life becomes forfeit must be the expression of free choice. A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. We would have to shut our minds to the plain significance of what here transpired to deny that this was a calculated endeavor to secure a confession through the pressure of unrelenting interrogation."

\* \* \*

"In holding that the Due Process Clause bars police procedure which violates the basic notions of our accusatorial mode of prosecuting crime and vitiates a conviction based on the fruits of such procedure, we apply the Due Process Clause to its historic function of

assuring appropriate procedure before liberty is curtailed or life is taken." Broad expressions of similar import were used by the court in *Turner v. Commonwealth of Pennsylvania,* and *Harris v. State of South Carolina, supra.* It is, however, a well established principle that such broad general statements as those above quoted should be interpreted and applied in the light of the particular facts in the case in which such statements were made, and are not necessarily controlling when considered in a subsequent cause in which the factual situation is materially different. *Capitol Life Insurance Co. v. Di Iullo,* 98 Colo. 116, 53 P. (2d) 1183; *Froid v. Knowles,* 95 Colo. 223, 36 P. (2d) 156; *Dunton v. Stemme,* 117 Colo. 327, 187 P. (2d) 593.

██ Before a confession can properly be admitted in evidence in the trial of a person accused of crime, it must be shown that the alleged confession was made voluntarily. "Whether or not a confession was voluntary, is primarily a question for the trial court. Its admissibility is largely within the discretion of that court; and on review, its ruling thereon will not be disturbed, unless there has been a clear abuse of discretion." *Osborn and Noakes v. People,* 83 Colo. 4, 262 Pac. 892. This rule has been recognized and applied under varying circumstances in numerous cases by this court. *Reagan v. People,* 49 Colo. 316, 112 Pac. 785; *Buschy v. People,* 73 Colo. 472, 216 Pac. 519; *Bruner v. People,* 113 Colo. 194, 156 P. (2d) 111; *Cahill v. People,* 111 Colo. 29, 137 P. (2d) 673.

██ Whenever there is evidence, not sufficient to require exclusion of the alleged confession, but sufficient to raise a question as to the weight to which it is entitled at the hands of the jury, the court must refer the question of the voluntarity of the confession to the jury under proper instructions. *Martz v. People,* 114 Colo. 278, 162 P. (2d) 408; *Roper v. People,* 116 Colo. 493, 179 P. (2d) 232. This procedure was followed in the case at bar.

■ We are not aware of any case in which this court has held an alleged confession to be inadmissible solely upon the ground that it was obtained by interrogation of the accused following his arrest. We cannot believe that the Supreme Court of the United States in the cases hereinabove cited intended to lay down a hard and fast rule that no confession obtained from a suspected criminal, following his arrest and prior to arraignment, can be received in evidence against him. Can we say that, in order to insure due process of law, the law enforcement officers of the state cannot take into custody and question one reasonably suspected of having committed an unwitnessed murder? We believe that the protection of the individual against abuses of power by the state demands no such interpretation of the due process clause of the state or federal Constitutions; nor do we think that the Supreme Court of the United States has taken that position, notwithstanding the language used as quoted from *Watts v. State of Indiana, supra*. The recent case of *Schneider v. People,* 118 Colo. 543, 199 P. (2d) 873, involved such a question and the United States Supreme Court denied certiorari in that case (338 U. S. 862), subsequent to the court's opinion in *Watts v. State of Indiana, supra*. We hold that the law enforcement officers of the state in their effort to solve a murder case, in the interest of justice, must have a reasonable latitude in arresting and questioning one justifiably suspected of being the murderer, and if in so doing the investigating authorities give proper consideration to the comfort and well-being of the suspected person, and conduct themselves in a manner free from threats, promises, or mistreatment of the suspect, a confession thus secured may be received in evidence, even though it was the result of several extended periods of interrogation of the accused.

The defendant in the case at bar was twenty-nine years of age; he was highly educated, having attended a prominent university well into the fourth year; his

business experience was varied and such as would show a keen intellect; he enlisted in the air corps of the United States army in 1943 and in 1946 was discharged with the rank of first lieutenant after serving as a navigator in three theatres of the recent war. Prior to his military service he served twenty-two months in prison following conviction on a "check charge." The defendant himself stated, concerning the questioning to which he was subjected, "Generally speaking it was done in a gentlemanly fashion."

Of even greater significance is the fact that it is undisputed that defendant's confession closely followed a two hour conference with a spiritual adviser of his own selection.

We conclude that the trial court did not abuse its discretion in receiving the confession of July 24th in evidence, and that under the circumstances here present the admission thereof in evidence did not amount to a denial of due process of law.

■ Second: *Was the corpus delicti sufficiently established by the evidence?*

At the close of all the evidence the defendant moved for a directed verdict of not guilty "for the reason that the corpus delicti has not been established without recourse to the alleged confession of the defendant." The motion was overruled and error is assigned on the ruling.

In *Bruner v. People,* 113 Colo. 194, 156 P. (2d) 111, we said: "It is well settled in this jurisdiction that the corpus delicti consists of two components: death as a result, and the criminal agency of another as the means, and it is equally settled that the corpus delicti may be established by either direct or circumstantial evidence. *Roberts v. People,* 11 Colo. 213, 17 Pac. 637; *Ausmus and Moon v. People,* 47 Colo. 167, 107 Pac. 204; *Bunch v. People,* 87 Colo. 84, 285 Pac. 766." The Bruner case is authority for the rule prevailing in this jurisdiction that circumstantial evidence is sufficient to establish

the corpus delicti in a homicide case if it is such as to prove the essentials thereof to a reasonable certainty.

In *Lowe v. People,* 76 Colo. 603, 234 Pac. 169, we stated:

"Proof that one charged committed a felonious homicide involves three elements; first, the death; second, the criminal agency of another as the cause; third, the identity of the accused as that other. The first two constitute what is known in law as the corpus delicti." * * * Each of these elements must be established by the prosecution to the satisfaction of the jury beyond a reasonable doubt. The court, however, is not the judge of the weight of the evidence. When sufficient has been produced to justify a submission to the jury and support a verdict of guilty, should such a verdict be returned thereon, the requirements of the law have been met. 'This rule applies to each of the elements of the corpus delicti as it does to the proof of the identity of the accused as the perpetrator; no more no less."

&ast;  &ast;  &ast;

"That proof may be made by any legal evidence, the same as proof of other facts." .

█ It is true that a conviction of crime cannot be upheld where it is based upon the uncorroborated confession of the person accused. There must be evidence of the corpus delicti apart from the statements contained in the confession. In the case at bar there is ample evidence, apart from the confession, from which the jury might properly find that the wife of defendant was dead, and that her death was brought about by "the criminal agency of another as the means." Defendant was the sole companion of his wife at the time of her death. There was blood on his shirt, which he stated was that of his wife. He directed those first upon the scene to the place where her body was found. The body was still warm. The position of the body, the fact that her clothing was not disarranged, the fact that pressure had been applied to both of her wrists and her

throat, the general topography of the terrain where she was found, were all inconsistent with the theory of accidental death. The ragged scalp wound in the back of the head of deceased corroborated the statement of defendant that he struck her a blow with a "rock about the size of two teacups." The defendant directed an inquiry to Dr. Wilson as to whether deceased's tongue was out when he first observed the body, and this unusual question was wholly the thought of defendant. The doctors who performed the autopsy testified that the cause of death was strangulation produced by pressure applied to the throat. Competent evidence tending to establish these facts was sufficient to establish the corpus delicti of the crime of murder, and the trial court did not commit error in overruling defendant's motion for a directed verdict on the ground that the corpus delicti had not been sufficiently proven.

■ Third: *Did the trial court err in refusing to strike certain testimony of Dr. Maly on the ground that the same was hearsay?*

Dr. Maly was one of two qualified pathologists who performed an autopsy on the body of deceased. On direct examination he testified concerning his external and internal examination of the body and expressed the opinion that death was due to strangulation. On cross-examination by counsel for defendant he stated that the strangulation was caused by pressure applied to the throat, and counsel questioned the witness at length concerning the condition of the larynx of deceased. In direct response to questions of defendant's counsel the doctor testified that he examined under a microscope a specimen of the larynx prepared by technicians outside his presence; counsel then pursued the inquiry and developed the fact that the microscopic inspection verified the conclusions to which the witness testified on his cross-examination, namely, that the cause of death was strangulation. No objection was made during the entire examination of the witness on the ground that

any answer given was not responsive to the question, and even after it appeared that the witness was not personally present when the technicians prepared the specimen, the cross-examination concerning the result of the inspection of the specimen continued. When the people rested, defendant's attorney made the following motion: "At this time the Defendant moves the Court to strike the testimony of Dr. Maly as the same relates to alleged injuries on the larynx of Mrs. Downey, for the reason that such testimony, as it was disclosed by the Doctor, is hearsay and was not based on his personal knowledge." The court overruled the motion, upon which ruling the defendant's counsel assigns error.

The opinion of Dr. Maly, that the cause of death was strangulation, as expressed by him on direct examination, was not predicated upon the results of the microscopic examinations which he made of specimens which he did not himself prepare. All testimony relating to such examinations was developed on cross-examination and without objection throughout the entire duration thereof. It may be that some portions of the testimony of Dr. Maly were subject to timely objection, in the absence of definite tracing of the specimen examined to the body of deceased. It does not follow, however, that all the testimony of the doctor relating to "alleged injuries on the larynx of Mrs. Downey" could be so considered. Furthermore, an accused cannot urge reversal on the ground that a witness, in making responsive answers to questions asked on cross-examination by his counsel, based some of his answers on the assumption of facts concerning which he had no personal knowledge—as in this case, the assumption by Dr. Maly that the specimen examined by him was in fact from the body of deceased. Counsel may not, by his own questions on cross-examination, invite the reception of evidence based upon hearsay, and thereafter assign error upon the admission of that evidence. Particularly is this true when questions are continued

which invite such answers after it is apparent that the answer will to some extent be based on hearsay. *Hightower v. State*, 62 Ariz. 351, 158 P. (2d) 156; *Phenneger v. People*, 85 Colo. 442, 276 Pac. 983; *Wigmore on Evidence* (3d ed.) vol. 1, p. 321, §18.

It follows that the court did not err in overruling the motion to strike the evidence to which reference is made in the motion.

██ ██ Fourth: *Did the trial court err in refusing to give instructions tendered by the defendant?*

Defendant tendered two instructions, each of which was refused. One of these was as follows: "You are instructed that you must find from the evidence, beyond a reasonable doubt, that the name of the deceased was Lolly Lila Downey, as alleged in the Information, and that if you should fail to so find, beyond a reasonable doubt, it is your duty to acquit the Defendant."

The insurance policies introduced, as bearing upon the motive of the defendant, were issued upon the life of the deceased under the name of Lila Loly Downey, or Lila L. Downey. The defendant informed Chief of Police Bruce that his wife's name was Lolly Lila Downey, and she was so named in the information. Whether her true name was Lila Lolly Downey, or Lolly Lila Downey could not possibly be "material to the merits of the case," or "prejudicial to the defendant" and under the provisions of section 490, chapter 48, '35 C.S.A., the variance, if any, could not warrant the giving of the requested instruction, and no error was committed in denying the same.

The second tendered instruction was as follows:

"What is meant by circumstantial evidence in criminal cases is the proof of facts and circumstances connected with or surrounding the commission of the crime charged; and if these facts and circumstances are sufficient to satisfy you of the guilt of the defendant beyond a reasonable doubt, such proof is sufficient to authorize a verdict of guilty.

"Where a conviction is sought on circumstantial evidence alone, as in this case, the People must not only show beyond a reasonable doubt that the alleged facts and circumstances are true, but the facts and circumstances must be such as are absolutely incompatible upon any reasonable hypothesis, with the innocence of the defendant, and incapable of explanation upon any reasonably hypothesis other than that of the guilt of the defendant."

The first paragraph of this second tendered instruction was in substance incorporated in the court's instruction No. 7. There was no error in refusing that portion of the instruction which in effect would have told the jury that the prosecution was based on circumstantial evidence alone. We have held that confessions, whether oral or written, are direct evidence. *Mitchell v. People,* 76 Colo. 346, 232 Pac. 685; *Ives v. People,* 86 Colo. 141, 278 Pac. 792. Since the alleged confession of the defendant was properly admitted in evidence, there was no error in the refusal of the court to instruct as requested.

The defendant was capably represented at the trial, and here, by counsel of ability and experience, and we are persuaded that he was afforded a fair trial in accordance with established rules of law. The assignments upon which he relies for reversal are overruled, and accordingly the judgment is affirmed.

Mr. Chief Justice Hilliard and Mr. Justice Holland dissent.

Mr. Chief Justice Hilliard dissenting.

In the matter of the confession of guilt admitted in evidence, the record here, as I am persuaded, parallels the composite of the records in recent cases determined by the Supreme Court of the United States relative to confessions, cited in the court's opinion, namely, *Watts v. Indiana,* 338 U. S. 49, 69 Sup. Ct. 1347, 93 L. Ed. 1434;

*Turner v. Pennsylvania*, 338 U. S. 62, 69 Sup. Ct. 1352, 93 L. Ed. 1443; *Harris v. South Carolina*, 338 U. S. 68, 69 Sup. Ct. 1354, 93 L. Ed. 1440. The conclusions reached in those cases, as I think, should be regarded as controlling. In that view, and not pausing for extended exposition, I find it consistent to dissent. The details of the offense, much emphasized in the court's opinion, are well calculated to cause even judges, for the nonce, to forget rules of criminal procedure, and justify on the enormity of the offending. It were well, I think, ever to keep in mind, that, "The history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States*, 318 U. S. 332, 63 Sup. Ct. 608, 87 L. Ed. 819.