Mr. Justice Moore
delivered the opinion of the Court.
We will refer to plaintiff in error as the defendant or by name. He was informed against for the crime of first degree murder to which charge he entered a plea of not guilty. Upon trial the jury returned a verdict of guilty and fixed the punishment at life imprisonment. Motion for a new trial was filed and overruled, and judgment entered on the verdict.
As grounds for reversal counsel for defendant argue:
1. That the court should have directed a verdict in favor of defendant.
2. That the court erred in admitting the testimony of Dr. Hunt.
*212 3. That the court erred in admitting in evidence “extra judicial statements of the accused.”
A brief summary of the facts concerning which there is no substantial dispute is as follows: August 5, 1960, a thirteen-year-old boy found a human leg in the bottom of a gully along a rural roadway known as Union avenue near the intersection with Quebec street in Arapahoe county. The sheriffs office was notified and officers investigated. They found the remains of a decomposed human body lying in a depression or “shallow grave.” The so-called “grave” was actually the embedded indentations caused by the body lying in old grass clippings and debris which had been dumped there. The grass clippings had been so depressed by the body as to show the complete outline of the corpse, and the places where the head, torso, buttocks and legs had rested were readily discernible. At a point immediately below the depression in which the head had lain there was found part of a leather belt which had been tied into a noose. The belt had grass clippings and human hair on it. The skull was found across the road a short distance from the torso and legs; a lower jawbone was found approximately fifty yards distant from the body; a neckbone was found twenty-five feet from the jawbone; the foot bones were missing, as well as the right arm. An animal tooth was found imbedded in an eye socket of the skull; articles of clothing and a watch were found which were identified as being that worn and owned by Phyllis Ann Columbo who was last seen alive in the late afternoon of June 9, 1960, at which time she had registered as a student in Opportunity School in Denver.
Prior to June 9th the deceased and the defendant were well acquainted. They lived close to each other in apartments on South Lincoln street in Denver. They spent the Decoration Day holiday together and had visited her mother together. Defendant was then employed at Gates Rubber Company and his work shift began at 11:00 P.M. On several occasions defendant *213 upon leaving his work in the early morning had gone to the apartment of deceased and had breakfast with her, and on several occasions took her to the store in Englewood where she was employed. He had been given keys to her apartment and at least on two mornings after her disappearance he entered her apartment where he prepared and ate his own breakfast. The landlord then requested that he turn over to him the keys to the apartment. Defendant made no report of Phyllis’ disappearance. The missing persons bureau was notified by others. Defendant was interviewed. He promised the police that if he left his then address he would notify them. Shortly thereafter he did notify the police that he was going to an address in California, where he was subsequently placed under arrest.
The district attorney called a witness who testified that she and her husband went for a drive in their car on the evening of June 9, 1960; that they drove south on the Valley Highway to Belleview where they turned east; that:
“As we drove out east from Valley Highway we went off the pavement on a dirt road. At the following intersection the headlights of the car shone on a car that was pax-ked on the south side of the road. I could see that it was a black Mercury with a white top.”
The witness went on to say that this was about 10 o’clock; that she recognized the car as that belonging to the defendant. She further stated that a man and a girl were in the car but she could not see who they were; that the girl’s hair was brown or brunette and the driver’s hair very much darker; that the location was at Dayton and Belleview and that the couple appeared to be having an altercation. She stated that she saw the defendant about one week thereafter when he was talking to the owner of the auto body shop where her husband was employed and that in defendant’s presence she said to her sister: “That is the kid that was parked out in *214 the boondocks with his girl friend the other night, they were fighting.”
She further stated that upon making that statement to her sister she looked at defendant and he was as white as a sheet and as white as the shirt he had on that day. Her knowledge of the car was amply sufficient to enable her to identify it as being the car of the defendant. Although this testimony was later discredited substantially by other evidence, the weight to which it was entitled was a matter for the jury. The substance of the testimony relating to the parked automobile was admitted by the defendant in a signed statement hereinafter considered.
William Maraggos, an investigator for the sheriffs office, testified in substance as follows: That he went to California accompanied by his assistant, Roy Vogt, and Clyde Vallano, a Denver detective. They contacted defendant on Saturday, August 15, 1960. They went with him to his apartment and from there they went to the sheriff’s office in Los Angeles and talked to defendant for one and one-half hours then sent out for sandwiches and coffee. Rhodes did not say much. He admitted he knew the deceased. He first denied he had picked her up on the night of June 6, 1960, but said he had taken her to work on that morning and that he had not seen her since; that he had returned to her apartment on the mornings of June 10th and 11th and fixed himself some breakfast and then the landlord asked him for the key because Phyllis was not around.
Rhodes asked Maraggos what he had found. He then said: “Could I have done it without remembering it?” Maraggos replied: “That is possible, I am not a doctor but that is possible, it has happened in the past.” Defendant then said, “Well, I must have done it.” He was then placed in jail in Los Angeles. Monday, August 17, he was given a hearing in court in Los Angeles; he was advised of his rights; given time to talk to a Public Defender in Los Angeles, and went out with that de *215 fender, presumably for a conference. On the trip back to Colorado the officers stopped in Las Vegas where defendant was lodged in jail. They did not discuss the matter with defendant in any way during the trip. They arrived back in Littleton on August 17, 1960, and and August 18th, after defendant had been given time to rest, he was questioned. August 19th defendant made a written statement in his own handwriting in the presence of Vogt, Maraggos, J. L. Skidmore and of Charles Thurston, who was a friend of the defendant. Rhodes was told when he wrote the statement to tell the truth as close as he could remember, and was told that he did not have to make a statement; nevertheless, he wrote the following:
“Frank Gilbert Rhodes
“June 9, 1960 I took Phillis to work at Whites in Ingelwood. She said she was going to register at Opertunity school and she wanted me to pick her up at the Cup and Saucer. I picked her up between 8-8:30 P.M. that night. We went for a ride south on the Valley Hiway. We turned off on Bellview and went east. We came to the end of the paving and went about % of a mile onto the gravel and parked. We were necking pretty heavily and I tryed to go all the way. She stopped me and said she wasn’t going to do it anymore unless we got married. I got so angry that I don’t remember what happened. When I came to my sences I was driving west on Bellview and she was sprawled out in the seat next to me. I didn’t know where I was going but I knew I had to get rid of her. I turned north just before I got to the Valley Highway and found a secluded spot. I drug her out of the car head first and layed her on the ground on her back and threw grass over her. I think I threw her shoes and purse out their but I don’t remember. The next thing I remember was going into her apartment and fixing my lunch for work.
Then I went to work.
“I wrote this statement of my own free will without *216 threats or promises from anyone and that this is the truth as far as I can remember so help me God.
Frank Gilbert Rhodes
“Witness:
William Maraggos, Jr.
Charles G. Thurston Roy Vogt J. L. Skidmore”
Maraggos stated that prior to the time that Rhodes wrote the foregoing statement he had told him that officers had found fingerprints on a belt in connection with their investigation of the crime. This statement was false. Maraggos also testified: “I said (to defendant) if he was mentally ill and depressed like he claims he was, that it would be taken care of and he would not be punished as bad.” Upon cross-examination of Maraggos the following testimony was given:
“MR. ERWIN: Mr. Maraggos, isn’t it true that you told Frank that you wouldn’t help him at all unless he signed this statement?
“THE WITNESS: I told him unless he was cooperative then I wouldn’t help at all.
“MR. ERWIN: And if he would sign the statement you would help him?
“THE WITNESS: I did not say that.”
Counsel for defendant objected to the admission of the written statement of defendant on the ground that it was not a voluntary statement and was secured under duress of questioning and promise of favor. The trial court, outside the presence of the jury, conducted an exhaustive hearing on this question and at the conclusion thereof ruled that the statement was proper for the consideration of the jury. A proper instruction was given to the jury on the subject under the procedure upheld in Downey v. People, 121 Colo. 307, 215 P. (2d) 892. The law as announced in that case is applicable to the instant case.
Following the making of the written statement by *217 defendant, the district attorney interviewed him and a stenographic transcript of the questions and answeis was admitted in evidence. Defendant at this interview generally repeated the facts related in his earlier written statement. His answers included the following: “I didn’t mean to do what I done. It just * * * .” “I didn’t do it on purpose.” Later he directed officers to the place where the body was found, and in the presence of sheriff’s officers he re-enacted the events which occurred on the night of June 9, 1960.
Dr. Hunt, a pathologist, was called and qualified as a medical expert. He testified at length concerning his examination of the body of Phyllis Ann Columbo. In summary he said that: The thoracic cage was intact as far as skeletal remains; that the lower half of the legs still had some flesh and tissue on them; that there was one arm missing and the right foot was missing; that the skull was not attached to the skeletal remains at all; that the state of decomposition of the body was pretty complete; that the cervical spine was affixed to the remains; the dorsal spine and lumbar spine and sacrum were attached; that he was shown two vertebrae which to the best of his judgment were cervical vertebrae; the cervical vertebrae were just straight skeletons with no tissue on them; there was no trauma to the vertebrae; there was no sign of a fracture or of a tumor, growth, or anything in that line; the skull showed no evidence of trauma; that there was no evidence of fracture, no penetrating type of wound or injury; the eyes were gone; there were a few remnants of hair in the occipital region of the skull; that there was little of anything to examine aside from the skeleton; that it was a female skeleton; and that he estimated from the length of the thigh and the torso that her height was five foot two to five foot four. Dr. Hunt was permitted to testify with relation to what he saw of the body that, “It was an unnatural death.” He was permitted to testify that:
*218 “I felt that with what I had before me that the individual had been strangled. Q. The individual was what? A. She had been strangled. Q. And can you tell us what facts you had before you which led to that conclusion, sir? A. First, there was belt, it was patent leather, it was about * * * Q. Did you examine the belt, sir? A. And I examined the belt. Q. And what did you find on the belt, sir? A. And on the inside edge or border at the back of the belt, opposite where there was a kind of a half knot, there was debris and that debris was matted brown hair and that hair to me was of the same color and texture as the hair that had been brought in along with the body.”
In overruling the objections of counsel for defendant to this evidence, the trial court stated:
“THE COURT: He is presumably an expert and he may testify to what his opinion is concerning the cause of death of this particular person if he has an opinion based upon his medical experience and his experience over a number of years as a pathologist — as to which he has qualified himself I believe sufficiently — and I think it is no valid objection that the defendant is afraid of what he will testify. That is not a valid objection. You may cross-examine him, maybe his opinion isn’t worth a cent. We don’t know, but at this point I don’t see anything objectionable.”
At the conclusion of all the evidence given by Dr. Hunt defendant’s counsel made the following motion:
“MR. YOUNG: If the Court please, at this time we would like to move to strike the Doctor’s testimony in its entirety. It is obvious that he is basing his conclusions on the fact that a belt was handed to him. Now, that is not a medical conclusion by any shape, form or description. It is up to the jury in this case to determine the cause of death and not the unexpert opinion of somebody who sees a belt and says ‘well, she must have been strangled.’ We don’t think that is proper evidence at all. It is not probative, it is opinion evidence *219 outside the scope of the Doctor’s knowledge, and it should be stricken in its entirety.”
To this motion the district attorney replied:
“MR. MILLER: If your Honor please, evidence is that thing which the law treats and reason and judgment understand. A medical physician based upon his years of experience in this particular work can reasonably testify as to what in his opinion the cause of death might have been. It isn’t your Honor, just the belt. It is the absence of all other factors which might have led to death. And further, your Honor, it isn’t just the belt alone, it is the belt with the brown hair and the matted debris and so forth in the loop, as the Doctor has testified to. So under the whole circumstance his testimony should remain, your Honor, and I submit it is properly a question for the jury.”
While the testimony of Dr. Hunt which we have quoted above might well have been stricken, the motion of defendant went much further and sought to strike all of his testimony, most of which was clearly competent and relevant. We are satisfied that no prejudice to defendant resulted from the admission of this testimony. The motion and statements of counsel occurred in the presence of the jury which had before it the testimony of the sheriff’s officers and others who first viewed the remains and described in detail the condition of the body, the remnants of garments and other articles, including the loop of a patent leather belt in such position as to indicate that it had been around the neck of the deceased.
Under the circumstances shown by the record here, the testimony of Dr. Hunt added nothing to the facts already before the jury, which in the situation disclosed was as competent as was he to determine the cause or causes which resulted in the death of the victim. Moreover, by Instruction No. 18, the jury was advised that they were not bound by the testimony of this witness; that his testimony was to be canvassed as *220 that of any other witness and adopted only so far as it appealed to their judgment. Whether the jury adopted or rejected Dr. Hunt’s testimony in to to, could have had very little influence on its resolution of the issues before it.
Under the circumstances disclosed by the record in this case, we think the following language quoted from Bridges v. Lintz, 140 Colo. 582, 346 P. (2d) 571, is applicable:
“The true test would seem to be whether the subject is sufficiently complex so as to be susceptible to opinion evidence, and, secondly, whether the witness is properly qualified to give his opinion. These difficult determinations are before the trial court and should not be disturbed on review unless they are shown to have been palpably erroneous rulings. It is clear that the matter cannot be determined by mechanically stating that it constitutes an invasion of the province of the jury since every conclusion is subject to this criticism. In view, however, of the fact that the jury can either reject or accept the opinion or give limited weight to it, we fail to see that reception of the evidence here constituted usurpation of the jury’s province. The jury was required to determine finally from the testimony and the cross-examination whether the opinion was entitled to any weight, and a reviewing court is in a poor position to conclude that the jury was unduly influenced by the opinion.”
The verdict of the jury and the judgment of the trial court entered thereon is overwhelmingly supported by the record before us. Perceiving no error in the proceedings below, the judgment is affirmed.
Mr. Justice Sutton not participating.