## No. 15,750.

### BROWN *v.* THE PEOPLE.

(178 P. [2d] 948)

Decided March 17, 1947.   Rehearing denied April 7, 1947.

Mr. MERRITT D. VONDY, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

Mr. Chief Justice Burke delivered the opinion of the court.

Plaintiff in error, hereinafter referred to as Brown, was convicted of murder in the first degree and, as per the verdict, sentenced to death. To review that judgment he prosecutes this writ. His eleven assignments may be thus summarized: 1. The judgment is not supported by the evidence; 2. Certain evidence for the people was erroneously admitted; 3. Certain evidence for defendant was erroneously excluded.

■ 1. This assignment rests upon the contention that the people failed to produce essential evidence of the corpus delicti. A brief statement of facts, either unquestioned or overwhelmingly supported by evidence, is essential to an understanding of our resolution. We omit immaterial details.

Defendant's victim was his paramour, Evelyn Smith, hereinafter referred to as Evelyn. In company with Mrs. Ingram and several men, one of whom was Williams, they participated in a social gathering beginning about 5:00 p.m. and culminating about 11:00 p.m. in an apartment at 2535 Clarkson Street, Denver. During that time the members of the party and the place of congregation varied. Some eating and a great deal of drinking, of beer, wine and whiskey, was indulged in. At no time, however, does it appear that anyone was entirely overcome thereby. Evelyn and the Ingram woman are referred to as "girls" but the latter was past middle age, both had been married and each appears to have had one or more children. It further appears that Brown was not the only man who had sustained a similar relation to his victim. So far as she was concerned, however, the attachment seems to have been cooling. He objected to attentions paid her by others that day and repeatedly sought to induce her to leave her associates and go with him to his room. Unsuccessful in this he went there himself, bathed, shaved, changed clothes,

armed himself with a shotgun, and returned to the above mentioned address where the two women and Williams were together. Finding the outer door locked he unceremoniously knocked out a window and entered. About this time some one put in a police call. Williams fled down a hallway, hid under a bed and remained there until the tragedy was over and Brown was in custody. After entering, and still holding the weapon, Brown had some conversation with the women. He again demanded that Evelyn accompany him to his room, threatening to kill her if she refused. The police having arrived and confronted the locked door made some disturbance attempting to effect an entrance. Their arrival was called to Brown's attention. His answer was a threat to shoot the first policeman who appeared. Some one turned out some of the lights and Evelyn fled down a darkened hallway. Brown fired after her without fatal effect. She crouched at a closed door, evidently attempting to open it, and then Brown poured two more fusillades into her reclining body. Meanwhile a number of officers had joined those first on the scene, the house was surrounded, shots were fired into it, one of which struck Brown in the chest without inflicting serious injury, and eventually he responded to the official demand that he come out and surrender. The walls surrounding the location where the woman fell were literally splattered by the discharge of the shotgun. Evelyn was taken to the hospital where it appears that she died the following day. Her body was thoroughly punctured over the right breast, the abdomen, the left forearm and both legs, with what the physicians who performed the autopsy described as "buckshot * * * innumerable wounds * * * It looked as though you had taken a pepper box and sprinkled." The cause of death, as stated by the physician, was "shock following multiple shotgun wounds, both legs, the abdomen and right breast." At the hospital Evelyn made a dying statement in which she asserted that Brown shot her "because I wouldn't go

with him." An officer had attempted to interrogate her before her removal from the building. There she made the same assertion and then said, "I am too sick to talk, have mercy on me, have mercy on me." Brown testified in his own behalf. He had entered a plea of not guilty by reason of insanity and asserted that he was, and long had been, insane. One physician supported him in this, others gave evidence unequivocally to the contrary. That defense has been abandoned here. Brown declared that his first shot was accidental but was unable to make any logical explanation of the others. At one time he said he procured the shotgun for defense against a member . of the party whom he knew to be armed. At another time that he took it along for a bluff, and again that he took it "for fun." He admitted having perpetrated an armed robbery in Missouri for which he was tried and received a sentence of ten years of which he served six.

The physician who performed the autopsy testified that none of the vital organs had been penetrated, but in several of the wounds there had been incisions and the sutures therein were in place. In other words there had been some probing for shots and the incisions had been sewed up. There was no reasonable cross-examination of the physician on this subject and no other evidence produced concerning it. On this slender thread counsel for Brown hangs his assignment of no proof of corpus delicti. The foundation is too frail to support the contention. The doctor says that the girl died of shock induced by the wounds inflicted by Brown. Had he testified that death was due to heart failure caused by the wounds the same argument could have been made and would have been equally persuasive. The corpus delicti in a homicide case means nothing more than death due to a criminal agency, i. e., "first the death; second, the criminal agency of another as the cause;" These "constitute what is known in law as the corpus delicti * * * When sufficient evidence has been produced to justify a submission to the jury and support a ver-

dict of guilty, should such a verdict be returned thereon, the requirements of the law have been met. This rule applies to each of the elements of the corpus delicti as it does to the proof of the identity of the accused as the perpetrator; no more no less." *Lowe v. People,* 76 Colo. 603, 234 Pac. 169. Our conclusion is that this assignment is without merit.

■ 2. A medical expert called by the state gave it as his opinion that Brown was sane. When asked if in his judgment the accused had the mental capacity to distinguish between right and wrong the question was objected to and, the objection being overruled, was answered in the affirmative. It is here contended that this was an invasion of the province of the jury and some authority to that effect is cited. With this position we are unable to agree. In a criminal case the question to be resolved is not in fact "sane or insane?" As to what constitutes insanity the experts, as well as laymen, radically differ. The real question is, responsibility. When it appears that one charged with crime was so mentally deficient or afflicted as not to know the difference between right and wrong, or knowing, lacked the ability to choose, there is no responsibility. If he knows the difference and has the ability to choose he is responsible —legally sane—whoever may call him insane. Hence the very purpose of expert testimony is to determine the defendant's knowledge of right and wrong and his ability to select his course. It follows that in this jurisdiction such testimony is always competent and material and in our opinion that rule is well known to the bench and bar of this state and has always been followed. It is supported by excellent and well reasoned authority. Rogers on Expert Testimony (2d ed.), p. 166, §69; *State v. Roselair,* 57 Ore. 8, 109 Pac. 865; *Powell v. State,* 25 Ala. 21; *Pflueger v. State,* 46 Neb. 493, 65 N.W. 1094; *State v. Lewis,* 20 Nev. 333, 22 Pac. 241. The same rule was applied in Iowa where the testimony was given by a lay witness. *State v. Porter,* 34 Ia. 131.

3. It is contended that the court improperly limited the examination of defendant's alienist, Dr. Hilton, who testified that Brown was insane, in that the witness was not permitted to state fully the basis of his conclusion. We do not find that the record supports the contention. The witness had gone quite into detail as to the facts and circumstances on which his opinion was based, but when counsel attempted to elicit communications between Brown and his own attorney the objection was made that this was hearsay. That objection was properly sustained.

Finding no reversible error in the record the judgment is affirmed and the date for its execution is fixed at the week beginning Monday, May 19, 1947.

MR. JUSTICE LUXFORD not participating.