## No. 16,769.

### Tate *v.* The People.
(247 P. [2d] 665)

Decided May 5, 1952.   Rehearing denied June 23, 1952.

Mr. Isaac Mellman, for plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. Norman H. Comstock Assistant, for the people.

*En Banc.*

Mr. Justice Holland delivered the opinion of the court.

ON February 28, 1950, while a resident of Adams county, Colorado, defendant took her two children, ages ten and twelve, with her to the office of the sheriff of Adams county and told him that she had something to tell him and wanted to tell it in the presence of her children. She then related the circumstances leading up to her finding, on February 10, the dead body of her ex-husband, who had been living at her place virtually all the time after he obtained a divorce from her in Reno, Nevada in 1945. She detailed her disposal of the body and her reasons for concealing the matter for the intervening eighteen days, and thereupon the sheriff summoned the coroner and district attorney and accompanied defendant to her home where they found the buried body as described by defendant. The body was immediately turned over to Dr. Lapi a pathologist at the Denver General Hospital, for an autopsy. An inquest was held on March 3, and the corner's jury returned a verdict "that Dot Hewitt came to his death feloniously on the Tate property in Adams County, Colorado, as a result of bullet wounds inflicted by party or parties unknown." Thereafter, and on March 6, 1950, the district attorney filed an information charging that defendant "Ella Hewitt Tate did unlawfully, feloniously, wilfully, deliberately, and of her premeditated malice aforethought, kill and murder Dot T. Hewitt * * *." This information was supported by an affidavit of verification of Homer W. Mayberry, the sheriff of Adams county, who stated, "That the facts stated in the foregoing information hereto attached are true and that the offense therein charged was committed of this affiant's own personal knowledge."

On defendant's plea of "not guilty," trial was had before a jury beginning October 16, 1950 and ending October 20, 1950, at which time the jury returned its verdict "guilty of murder in the second degree in the manner and form as charged in the information filed herein." Motion for new trial, containing fifty-two

grounds, was filed, argued and overruled, not by the judge who tried the case, but by another judge of the district, the term of the trial judge having expired, and defendant sentenced to from fifteen .to twenty years in the state penitentiary.

On the facts appearing in the record, which will be hereinafter narrated, defendant, now plaintiff in error, seeks reversal on the following grounds: 1. Venue not established; 2. Corpus delicti not established; 3. Deputy sheriff acting as juror; 4. No evidence of wilfullness, deliberation or premeditation; 5. No. evidence of first degree murder; 6. No evidence of second degree murder; 7. Failure of court to give instruction defining malice; 8. The court erred in answering inquiries of jury; 9. Insufficient evidence to warrant verdict of guilty; 10. Error in denying motions for directed verdict.

Since we are satisfied that the judgment herein must be reversed, we might well conclude this opinion on the ground that the evidence does not support the verdict; however, other pertinent and material questions are presented, and we feel that in order to avoid repetition of like error in future cases, we should discuss some of the assigned errors, after a narration of the facts as shown by the evidence.

Defendant, a woman now thirty-nine years old, was married to Dot T. Hewitt, the deceased, in February 1936 in Oklahoma, to which marriage two children were born, Robert Cooper Hewitt, now twelve years old, and Joyce Evelyn Hewitt, nine years old. The deceased was sixty-nine years old at the time of his death; that he had been in bad health, had had operations and possibly was afflicted with cancer, over a period of years, is not effectively disputed; that he had made attempts to take his life; had frequently expressed his desire to end it all; and talked about it to other people; is clearly established. That he was obsessed with ideas of inventions and was of a restless nature and disposition is not denied. We find nothing in the record to in-

dicate any turbulent or unpleasant life with defendant. Out of a clear sky in about 1945, he displayed what he claimed was a Reno divorce decree to defendant, saying that he had paid a Denver lawyer two hundred dollars to get it for him. Defendant, being unable to understand this unexplained action on the part of deceased, questioned the authenticity of the divorce decree and said she was going to see a lawyer to find out about it. He thereupon did go to Reno and finally obtained a divorce; however, he came directly home to defendant where they lived at the time of the alleged crime. He did make short trips here and there about the country and would stay with the children a part of the time while defendant was at work. He suggested to defendant that she marry Tate, a service man, whom they both knew and who had frequented their home, with the further suggestion that he, Tate, could support her and help take care of the children. Apparently without too much romance, defendant married Tate, who soon developed into a drunkard and spent all of his earnings in that fashion. It seems that deceased, defendant and Tate all occupied the same home without any apparent difficulties or trouble. Deceased had not lived with defendant as man and wife since 1944. Tate finally left for good and defendant divorced him in June of 1947. Deceased remained in the home except for short intervals during all of this period up to and including the date of the alleged crime. He was sick and complaining most of the time and talked about suicide at least two or three times a week. The testimony of neighbors and friends who visited the home was to the undisputed effect that there was no difficulty between defendant and deceased and that she gave him constant care and was kind to him and waited on him many times in the night, which was necessary with his particular illness. The two children testified to this same general effect. On account of the children, deceased did not want to be spoken of as defendant's

"ex-husband." For the last several years of his life deceased did strange and unexplainable things. He owned no property at the time of his death and was receiving an old-age pension. He caused the property which had been in his name, together with that of defendant, to be conveyed to defendant in 1947. There is no record of his having life insurance.

On the morning of February 10, 1950, defendant, at about seven thirty o'clock in the morning, took their twelve-year-old boy who had very defective eyesight, to a school for children of that type at 11th avenue and Acoma street in the City of Denver. When she left home, deceased was in the house and something was said between them about his putting the cats out of the house after she left. There appeared to be nothing unusual at that time. After delivering the boy to the school, defendant then called upon an old lady at 1243 Bannock street, who was ill, and defendant, having worked in a chiropractor's office, gave the old lady some attention and care and then went to their home near East 56th avenue and Holly street in the corner of Adams county. Arriving there at about eleven fifteen o'clock A. M., she went in the back door and noticed an odor of some kind and started through the kitchen when she looked into deceased's bedroom and saw him slumped over in a chair. She said she was "frozen" for a few moments; that deceased was tied to the chair with several strands of binder twine around his body and the twine attached to handles of a bureau or dresser nearby and connected with a "contraption" made of four or five coat hangers in which was the automatic pistol which had been in the house for a number of years. She observed blood on the back of his head and some on his hip; that he was fully clothed in blue jacket and overalls and there was some blood on the floor. Panic stricken, she said the first thought that came to her was that he had finally done the job and that she did not want the children to ever know that

he had committed suicide, and quickly decided to take the body out and bury it. With scissors, she cut the binder twine, released the body from the chair, wrapped a quilt and papers and gunny sack around his head and dragged him down the back steps for about seventy-five feet near a little house on the premises where she dug a grave approximately two feet or more in depth and rolled the body in as best she could; then poured fuel oil all over the body and the dirt; covered the grave with a sheet of corrugated iron; and then piled pieces of lumber, posts and such material on the grave and a chicken coop on top. She then went in and cleaned up every trace of the conditions in the room and took all of the twine, some shells she found on the floor, the coat hangers and an old pillow to the incinerator and burned them; she then cleaned up the floor with clorox, because she did not want the children to notice that anything had happened about which they would be asking questions. By this time it was nearly two o'clock and time for her to go after the children; she met them, and their first words were, "How is Daddy?" She told them that he had left and was likely going to see some relatives, or words to that effect. She became ill with the "flu" and was quite sick and troubled and distressed and on February 28, she took the children in the automobile and headed for the sheriff's office in Brighton, the children wondering where she was going. She finally aroused the sheriff and told him she had something she wanted to tell him, and wanted to tell him in the presence of the children. She then related the story, the substance of which has just been stated. The sheriff immediately summoned the coroner and the district attorney, took defendant to her home where she co-operated with the officials in every way and answered all questions freely, and conditions were found just as she had detailed. The sheriff screened the contents of the incinerator; found the coat hangers, and shells from the pistol; and after recovering the

body from the grave, he directed that the body be turned over to Dr. Lapi, a pathologist at Denver General Hospital, for an autopsy. Dr. Lapi's testimony at the inquest and on the trial disclosed that deceased had been shot five times, four of the wounds were more or less superficial, except one that entered the jaw and made exit under the ear on the opposite side of the head which, he testified, could cause death in thirty seconds. While no bullets or bullet marks were found any place, it was shown that the shells obtained were loaded with steel jacket or soft-nosed bullets, and that all of the bullets went through and out of the parts of the body. Dr. Lapi further testified that the body had been buried for some time and that certain blood-control tests were made in the bedroom to determine whether there was any blood in the room, but he was unable to find any evidence of blood and stated that fresh blood could be easily wiped away by the use of an oxidizing agent, such as clorox, if applied in sufficient strength. He testified that all of the wounds could have been self-inflicted; and at the inquest, he stated, "There is nothing to preclude his having fired the four relatively insignificant shots first and then the fatal last." On further re-direct examination, he qualified the statement that it was possible that it could have been a suicide by stating that it was remotely possible.

The sheriff, coroner and a representative of the district attorney's office spent several hours in the home and made a minute search of the entire premises, even to the window draperies and the mattresses on the beds, and were never able to locate any trace of bullet marks, either inside the house or out on the premises.

Defendant, in her statement, said that she took the pistol and released and discharged the safety on it and laid it up on the kitchen shelf. It was found in exactly that place and a gun and ballistic expert testified that on testing the weapon that it had a ten- or twelve-pound trigger pull, which, as explained, was a rather hard

or heavy pull, before releasing the hammer. There was no attempt on the part of the prosecution or the defense to reconstruct the "contraption" of the twine, coat hangers and pistol as related by defendant. There were no fingerprints taken and not a word of testimony was introduced concerning powder marks or powder burns in connection with the shooting.

■ The 565-page record is interesting and exceptional in that there is not the slightest whisper or indication of any kind of motive for a killing on the part of defendant, nor any outsider. Family relationships were reasonably pleasant so far as quarrelling and trouble of that kind is concerned; deceased had no property, no life insurance, and there is no indication of another man or any other person involved that would create a suspicious circumstance pointing toward the guilt of defendant. Her entire statement was freely and voluntarily given to the sheriff, to the coroner, and finally reduced to writing and signed by her, and there was no variance from that statement in her testimony when she voluntarily took the witness stand in her own behalf. As weird and generally unnatural as her conduct in connection with the tragedy is, her statement and testimony bear not the slightest earmark of a fabricated story, designed for her benefit. Considering each and every circumstance of defendant's life with deceased, his peculiarities and illness, his mental state relative to his desire to end all of his misery, and defendant being suddenly confronted with such a tragedy, it is not within the power of any human to know what the mental processes of any other human might be under like circumstances. The thought of improbability and suspicion naturally follows; however, guilt of an accused cannot finally rest on suspicion.

■ Counsel for defendant diligently urged throughout the trial that venue had not been established, that is, that the burden was upon the people to show that the crime, if any, had been committed in the county

where the venue had been laid. The question of venue, when made, is an issue to be determined the same as any other issue in the case. It also is true that the burden of proving proper venue is on the people, however, as this court has many times determined. It may be proven by circumstantial evidence and proper inferences to be drawn therefrom. The finding of the body in Adams county, aided by no direct or other circumstantial evidence, is sufficient to warrant an inference that the crime, if any, was there committed, and that is a rational conclusion. Nevertheless, if the jury was to determine this issue in the case, under the circumstances here, it was error for the court to refuse to give the following tendered instruction: "The jury is instructed that the courts of Adams county have jurisdiction in criminal cases only of crimes which are committed in Adams county. Therefore, unless you find from the evidence beyond a reasonable doubt that the shooting and killing of Dot T. Hewitt took place in Adams county, your verdict must be not guilty." It was for the jury to be satisfied beyond a reasonable doubt, if only by an inference from the circumstances, that the crime, if any, was committed in Adams county, when called to their attention by an instruction. It cannot just be taken for granted. "Venue is a matter that may be inferred from all the evidence in the case." *Brock v. People,* 67 Colo. 389, 390, 176 Pac. 744. "In such a case, 'It is sufficient if there is evidence from which venue can be reasonably inferred, or if, from the facts and circumstances in evidence, the only rational conclusion which can be drawn is that the crime was committed in the county alleged, * * *.' " *Dustin v. People,* 116 Colo. 433, 181 P (2d) 457. The error above pointed out was without appreciable prejudice to this defendant, because, if her statement is to be accepted as true, then there was no crime committed so far as she was concerned and in the absence of any inflammatory atmosphere, she was not prejudiced because of the lo-

cation of the trial. Accepting her statement at face value, that she did not shoot deceased, and that she believed he had at last committed suicide, then, so far as she was concerned, no crime on her part had been committed; therefore, venue was of no serious consequence. In other words, if it was suicide, then the question of venue is out of place.

██ We believe that it is successfully contended, and so contended throughout the trial, that the corpus delicti, namely, the body of the offense and the essence of the crime was not established. Our earlier cases clearly set up the law in this state, as elsewhere, that it is elementary that the corpus delicti in all cases of homicide must be proven beyond a reasonable doubt, either by direct or circumstantial evidence. These cases establish that the two elements of corpus delicti must be proven, namely, death as the result of an act performed or a wound inflicted; second, that such act was unlawfully performed or such wound was unlawfully inflicted by another. *McBride v. People,* 5 Colo. App. 91, 37 Pac. 953; *Ausmus and Moon v. People,* 47 Colo. 167, 107 Pac. 204. The later expressions of the rule in this state are found in *Cobianchi v. People,* 111 Colo. 298, 141 P. (2d) 688, and *Bruner v. People,* 113 Colo. 194, 156 P. (2d) 111. We find in *Bruner v. People, supra,* approval of the following quotation from 1 Wharton's Criminal Law (12th ed.), p. 458 §353, "It seems now pretty generally held that circumstantial evidence is admissible to establish the *corpus delicti* in a trial for murder, but that it must be strong and cogent. * * *." Also approved quotation from Underhill's Criminal Evidence (4th ed.), p. 45, §37, "The corpus delicti, and all the elements thereof, may be proved by circumstantial evidence, from which the jury may reasonably infer that a crime has been committed. Such evidence must exclude every reasonable hypothesis except guilt, and be convincing to a moral certainty; and such proof of cor-

pus delicti must be the most convincing and satisfactory proof compatible with the nature of the case."

As already may be clearly observed, the only proof relied upon in this case is purely circumstantial. However, in face of the testimony of the autopsy physician that the gunshot wounds causing death could have been self-inflicted, and that it was possible the case was one of suicide, we must say that all other circumstances are not sufficiently cogent or sufficient to exclude every reasonable hypothesis except guilt; and that the circumstances are not convincing to a moral certainty; therefore, from the record, we must, and do, determine that the corpus delicti was not established. There is no circumstance that points beyond a reasonable doubt to any motive that would cause defendant or any other person to kill the deceased.

By section 16 of article II of the Constitution of the State of Colorado, the defendant in a criminal prosecution is entitled to "a speedy public trial by an impartial jury * * *." Our statutes specify certain exemptions from jury service. The well-reasoned cases in other jurisdictions hold that police officers and law-enforcement officials should not be allowed to serve on juries in criminal cases, especially if challenge is made.

In the instant case an entire day, October 16, was consumed in the selection of a jury. One juror called to the box for voi dire examination was a special deputy sheriff under the sheriff of Adams county who was the prosecuting or complaining witness in the case. This juror was asked the usual question as to whether he knew of any reason why he could not sit as a fair and impartial juror and was further asked if he was a sheriff, to which questions he replied, "No." At the close of the day's proceedings, a jury had been selected, including this juror and the jury sworn and excused for appearance the next morning. On his way to the court-room the next morning, counsel for defendant was advised that one of the jurors selected was a special deputy

sheriff. As counsel says, he did not stand by and gamble on the results, but he immediately presented his information to the court and challenged the juror before any evidence was taken. The district attorney then stated that the juror was not regularly employed on a salary, but that he had a commission by appointment from the sheriff and that he drew no renumeration from the county *other than for special services performed at the request of the sheriff.* The district attorney made the further objection that counsel for defendant did not ask the juror on voi dire if he was a special deputy. This is an exaggerated idea of a voi dire examination. The sheriff was present, and, of course, had knowledge that the challenged juror had a commission as special deputy, and we must assume that the district attorney knew, or should have known of this fact. Proper practice and evidence of an earnest effort to afford defendant a fair and impartial trial, should have prompted the district attorney, after challenge was made, to have joined in the request for dismissal of the juror. Regardless of whether the district attorney agreed or not, it was the plain duty of the trial court on the showing made to discharge the juror from further service and call in other jurors from whom a qualified juror could be selected. The trial court denied the request, stating that he did not think the juror was disqualified, and further stated "If he were an active deputy sheriff, of course, counsel would have probably known about that and would have challenged him either for cause or by pre-emptory challenge." Scrupulous observance of all rules in the selection of a jury should be observed by the prosecution as well as the trial court to the end that an impartial jury be selected. In this case the juror, as a deputy sheriff, would be presumed to be under ordinary allegiance to his superior, the sheriff, who was the prosecuting witness in the case and his remuneration as deputy sheriff was wholly dependent upon such services as he might perform at the request of his superior;

a clear disqualification that should have immediately been observed by the trial court. Where other law-enforcement officials, including the sheriff, were material witnesses in the case, the disqualification of this juror was not even a debatable question. Our statute merely states exemptions from jury service, it does not state qualifications. Loyalty to his superior officer would undoubtedly be expected to have its weight.

The challenge was here made in apt time, and it was reversible error for the court to overrule it. It is held under many reliable cases that verdicts may be set aside, new trials granted in such instances; therefore, following this reasoning to its logical conclusion, a challenge made before any evidence was taken was in apt time and not after an unfavorable verdict would augment the reason for assigning error thereon.

We need not further detail the circumstantial evidence or lengthen this opinion by a discussion of the pertinent question raised by the statement that there was no evidence of willfullness, deliberation or premeditation. The entire record is wholly barren of the slightest indication of these essential elements of the crime charged, and we may conclude on this subject by now saying that the evidence does not support the verdict and especially the verdict of second degree murder. Second degree murder implies a willful act, an unlawful killing with implied malice aforethought, but without deliberation and premeditation. Malice is not implied as a matter of law, but is a question of fact and whether or not it is to be implied under the circumstances of the case is a question for the jury. We see no reason in the evidence for the instruction on second degree murder, because there is no appearance of provocation or the implication that there was considerable provocation. To instruct a jury that they may imply something from evidence that does not appear, is error. Under the shown circumstances, there is no place to imply malice in this case. If it is not a case of suicide,

then it may be presumed that whoever committed the act did so deliberately and with express malice. Any finding in this case of deliberation, premeditation, willfullness or any of the other ingredients of either first or second degree murder could only be based upon a suspicion as foundation for a presumption and then finally another presumption based upon the primary presumption. Presumption and inferences may be drawn *only from facts established,* and presumption may not rest on presumption or inference on inference. *Dodo v. Stocker,* 74 Colo. 95, 219 Pac. 222; *Mountain Motor Fuel Co. v. Rivers,* 65 Colo. 561, 170 Pac. 1164; *Elliott v. People,* 115 Colo. 382, 174 P. (2d) 500; and this rule is doubly applicable in criminal cases.

Considering the contention of defense counsel that the trial court erred in instructing on first degree murder and submitting a proposed verdict on first degree murder, we realize that this court has stated that it was not prejudicial error when the verdict returned is of second degree. With equal force we have stated that the trial court should not instruct on a degree of homicide not sustained by the evidence. *Battalino v. People,* 118 Colo. 587, 199 P (2d) 897; *Smith v. People,* 120 Colo. 39, 206 P. (2d) 826; and a number of other cases. We are now inclined to re-evaluate the statement in *Ryan v. People,* 50 Colo. 99, 114 Pac. 306, that it was not prejudicial error to instruct on first degree murder when the verdict returned was of second degree. When this court holds in a majority of cases that a trial court should not instruct on degrees of homicide not sustained by the evidence, then in this case, we must say that by such an instruction here, error obtains. The fact that the trial court gave an instruction on first degree murder when the essential elements are missing in the proof, it must be said that the jury could easily infer by the giving of such an instruction that these elements were present in the case. It presents a fertile field for discussion among jurors not skilled in legal technique, for

542

finding a welcome opportunity to compose differences and agree upon a compromise verdict. We must say that it was prejudicial error under the circumstances of this case to give the instruction on first degree murder in the absence of proof of the necessary elements.

We need not indulge in much further discussion of the question of malice in view of what we have just said, however, in the instant case, the trial court, by its instructions, told the jury that malice might be implied and there left the jury to speculate on what malice might be. There was no definition of malice given to the jury. It is well known that there is a distinction in the forms of malice, namely, "odius" and "malevolent" and malice in another sense may be found from "reckless and wanton acts." In the instant case the jury would first have to presume that defendant fired the shots which killed deceased; then they would have to presume that in doing so, defendant acted without provocation or with an abandoned and malignant heart, and therefore the final presumption is based upon a primary presumption and is consequently a violation of the fundamental rule, doubly applicable in criminal cases.

Mature consideration of all the evidence adduced fails to satisfy us of its sufficiency to support and sustain the verdict rendered. We cannot say, even under the peculiar circumstances of the case, that strong probabilities or strong possibilities of the guilt of defendant exist. Convictions for murder must be grounded on something more than probabilities, possibilities or suspicions of guilt. Aside from the fact that we are convinced that the evidence does not support the verdict, we must say that in view of the errors herein pointed out, defendant did not have the benefit of a fair and impartial trial.

For the reasons herein stated, the judgement is reversed and the cause remanded with directions to dismiss the information.

MR. CHIEF JUSTICE JACKSON and MR. JUSTICE ALTER concur in the reversal on grounds specifically set out in a concurring memorandum.

MR. JUSTICE STONE and MR. JUSTICE CLARK not participating.

MR. JUSTICE ALTER.

I dissent from the order of dismissal and am of the opinion that the cause should be reversed and remanded for further proceedings in harmony herewith.

It is my opinion that the trial court committed error in the following respects: In refusing to sustain defendant's timely challenge for cause of a juror and thereby permitting a deputy sheriff to sit as a juror on the trial; in failing to properly instruct the jury by defining malice, premeditation, intent and deliberation; in refusing to give a proper instruction on the question of venue; and in answering the jury's inquiry as to its right to recommend leniency.

MR. CHIEF JUSTICE JACKSON concurs.

On petition for rehearing, Mr. Justice Stone and Mr. Justice Clark participate and also concur herein.

On Petition for Rehearing.

On petition for rehearing, the original opinion is modified as to disposition by remanding the case with directions to grant defendant a new trial. The petition for rehearing is denied.