No. 25598

**The People of the State of Colorado v. Ray Manuel Strohm**
(523 P.2d 973)

Decided June 24, 1974. Rehearing denied July 15, 1974.

John P. Moore, Attorney General, John E. Bush, Deputy, Robert C. Lehnert, Assistant, for plaintiff-appellee.

Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, Thomas M. Van Cleave III, Deputy, for defendant-appellant.

MR. JUSTICE LEE delivered the opinion of the Court.

This is a child abuse case. The events which culminated in the tragic death of Nerio Antonio (Pat) Chavez led to the filing of a four-count information charging the three-year-old boy's mother and stepfather with murder, conspiracy to commit murder, mayhem, and assault with a deadly weapon.

The mother, Antonia Bernalda Chavez, in a separate trial on her plea of not guilty by reason of insanity, was adjudicated insane and committed to the Colorado State Hospital.

The stepfather, Ray Manuel Strohm, was tried and convicted by a jury of second-degree murder, mayhem, and assault with a deadly weapon. Strohm was sentenced to the state penitentiary to serve concurrent terms of punishment at hard labor, as follows: a term of not less than thirty nor more than forty years for second-degree murder; a term of not less than ten nor more than fifteen years for mayhem; and a term of not less than three nor more than five years for assault with a deadly weapon.

We affirm the convictions of mayhem and assault with a deadly weapon. We reverse, however, the conviction of second-degree murder for lack of proof that the death of the child was caused by felonious means.

The case against appellant was based entirely on circumstantial evidence and was tried on the theory that Pat's

mother was the principal offender and that appellant was an accessory to the crimes. We therefore review the evidence in substantial detail.

Appellant and Antonia Chavez commenced living together as common-law husband and wife in Maxwell, New Mexico. At the time, Antonia's son, Pat, was residing in a foster home where he had been placed by the New Mexico Department of Public Welfare. Appellant and Antonia came to Colorado seeking work. He was successful in finding employment as a farm laborer on the farm of Herb Leis near Brush, where he and Antonia moved into a tenant house.

Attempts had been made to persuade Antonia to relinquish her son in New Mexico. She was reluctant to do so and eventually permission was granted to her to assume the temporary custody of Pat and remove him from the New Mexico foster home to their new home on the Leis farm, under the supervision of the Morgan County Department of Public Welfare. This was accomplished in the middle of August 1971. At the time Pat joined appellant's household, he was described as a normal, healthy and happy child. This condition, however, did not continue for long, as the record demonstrates.

The Morgan County child welfare supervisor assigned to the case made repeated efforts to visit appellant's home and the child. She was rebuffed on each occasion by Antonia, who refused to answer the door or to permit the caseworker to enter the home and examine the child. The only visitors to the home were Servando and Susie Villanueva, who were close friends of appellant and Antonia. They frequently visited on weekends and observed the steady deterioration of Pat during the three-months period prior to his death. During a typical visit, Antonia and Susie would converse privately while appellant and Servando would have their separate conversation. While the child's condition was never discussed by Susie with appellant, she did overhear appellant on one occasion express fear and concern that others might notice the marks on the boy's body.

Susie testified concerning suspected abuse of the child. She

described various bruises and marks on the boy's body. Although neither appellant nor Antonia were ever seen to strike or hurt the child, Antonia did in her conversations with Susie implicate herself as the principal offender in abusing the child. Illustrative of the mother's attitude toward her son is the testimony of Susie concerning one of her early visits, shortly after Antonia had gained custody of the child. Susie testified:

"* * * She told me and Salvadore [sic] when we went over, you know, we had not gone over to see the little boy yet and we both went. And she told in Spanish it was her son and if she wanted to kill him she would kill it. * * *"

Concerning another conversation, Susie testified:

"I told her, 'How come he was so bad bruised.' I said, you know, 'How come he is bruised?' She said: 'He is going to do what I tell him.' "

Again, as to another conversation, Susie testified:

"* * * I said, 'How come you hit him so much?' She said, 'He's going to do what I tell him.' "

As to a further conversation, she testified:

"* * * And the little boy was burned on his feet. She had stuck him in boiling water.

"Q How do you know that?

"A She told me. And she changed the subject; 'If I have to boil him in water he'll do what I tell him.' "

Finally, at another point, when Susie's child was acting up, Antonia pulled out a whip-like electrical cord, folded in parallel lengths (People's Exhibit CC), and stated:

" 'If he was my little boy I'd hit him with this because this is what my son gets.' "

Because of her concern for the boy's condition, Susie asked and received permission on occasion to take him to her home overnight. However, for the last three-weeks period before the boy's death, Susie was never permitted to see him. He was locked in his room, presumably for purposes of punishment.

On Monday, prior to the boy's death on Tuesday, November 2, 1971, the Villanuevas visited in appellant's

home. Pat was again locked in his room. Appellant was working in the fields. The Villanuevas and Antonia went to the market to buy food. There, Antonia was asked: "Aren't you going to buy Pat one [TV dinner]?" She responded, "No, he doesn't hardly even eat any more."

The evidence showed that appellant worked almost daily in the fields as a farm laborer, while the child was in the care of its mother. On a few occasions when his boss, Herb Leis, observed appellant with Pat outside the house, Leis did not notice any unusual or abusive treatment of the child by appellant. To Leis, the relationship between the stepfather and the boy appeared to be a friendly, normal one. Leis testified he was unaware of any child abuse.

On November 2, at approximately 10 a.m., appellant and Antonia appeared at the emergency room of the East Morgan County Hospital. Appellant was distraught and weeping. He was carrying Pat wrapped in a blanket. He asked for help, explaining that about one-half hour earlier the child had choked on a piece of bologna and had stopped breathing. It was immediately determined that the boy was dead and had died several hours earlier. The attending physician examined the boy's windpipe and found no evidence that the child had choked to death. Later, however, sheriff's officers did find a small piece of bologna in an ashtray in appellant's living room.

The doctor inquired concerning the many bruises and abrasions on the child's body. Appellant and Antonia explained that the boy had accidentally fallen into two abandoned wells near their farmhouse.

The sheriff was notified and an autopsy was ordered. Postmortem examination revealed that the cause of death was a subdural hematoma caused by a "head-in-motion" injury, complicated by pneumonia. A detailed examination of the boy revealed numerous bruises and cuts on the head, including two recent lacerations on the forehead; several small puncture wounds in and about the ears; several marks on the neck of a linear nature, six linear marks across the chest, three inches or so in length; several excoriated linear

marks across the thorax and lower abdomen; multiple bruises and an excoriated area on the left lower leg, which was identified as evidence of an old burn, and a similar burned area on the toes of the left foot. The bruises, abrasions, lacerations and burns, in the opinion of the examining pathologist, were not associated with the boy's death.

The medical evidence concerning the subdural hematoma indicated that it resulted from a head-in-motion injury, that is, the head while in motion struck a stationary object causing the skull to come to an abrupt halt, thus severely jarring the brain and rupturing the meningeal vessels at the site of the hematoma. This is in contrast to a head injury occurring where the head is not in motion but is struck a blow by a moving object, which generally causes damage to the skull, such as a depression fracture. The pathologist testified that death here did not immediately follow the head-in-motion injury but occurred gradually as the blood clot built up pressure against the brain, causing loss of bodily function, the complication of pneumonia, and ultimate death. The doctor's testimony indicated that the head-in-motion injury and resulting subdural hematoma frequently occurs in battered children cases; however, he also testified that this type of injury frequently happens accidentally as a result of the normal play of children while running and falling down.

Medical testimony supported the conclusion that the striped-like contusions and lesions on the boy's body could not have occurred accidentally but were likely inflicted by use of the whip-like electrical cord, Exhibit CC.

When appellant was asked about the large burned area on the boy's left leg, he stated that the boy accidentally touched against a hot potbelly stove, approximately three days before his death. Antonia joined in this explanation, contrary to her earlier suggestions that the child was burned by hot water. Medical testimony indicated these burns were old, probably incurred many days prior to death, and that they were not self-inflicted but possibly could have been incurred accidentally. Other prosecution evidence, however, demonstrated

that by reason of the physical dimensions of the stove compared to the small stature of the three-year-old, it was highly improbable that the severe burns could have been accidentally incurred, suggesting that on the contrary they were probably forcibly inflicted.

Concerning the recent lacerations on the forehead of the child, appellant explained that they happened accidentally when the boy fell, striking his head on a mop. Medical evidence suggested these wounds were severe enough to have required sutures.

Significantly, no efforts were made by either appellant or Antonia to ever seek medical treatment for the burns, the lacerations, or the other injuries suffered by the child.

During the afternoon of November 2, appellant and Antonia accompanied sheriff's officers to their home where an inspection was made of the house and the surrounding premises. The officers were led to the first of two wells into which the boy allegedly fell. An examination of the well revealed that the debris in the bottom was undisturbed and covered with cobwebs. The other well also appeared to be undisturbed. It was covered by a snugly-fitting metal lid weighing approximately thirty-five to forty pounds.

At a later visit to the premises on November 6, Antonia took the officers to another hole in the ground where the whip-like electrical cord was recovered from under a door at the bottom of the pit. Also, she pointed out hidden among some weeds a piece of green plastic hose (Exhibit DD) which presumably was also used to discipline the child. Inspection of the house revealed numerous suspected blood spots on the underside of a mattress, on a child's clothing, and on the bedroom floor.

Appellant elected not to testify. His defense consisted of testimony from his brother and sister-in-law concerning his kind disposition toward a stepdaughter by a previous marriage and toward their own child.

As grounds for reversal of the convictions, appellant contends, first, that the evidence was insufficient to support the verdicts of guilty and therefore judgment of acquittal

should be entered in his favor; second, that the verdict of guilty to second-degree murder was inconsistent and conflicts with the verdict of not guilty to involuntary manslaughter; third, that prejudicial error was committed by improper instructions to the jury on circumstantial evidence; and, fourth, that the admission into evidence of photographs of the deceased boy unfairly prejudiced the jury against him.

We do not discuss the second ground for error asserted for reversal, as it was not raised on motion for new trial. We find it to be novel but totally without merit, and in view of our disposition of the homicide issue a theoretical discussion would be only of academic interest.

## I.

It is fundamental in felonious homicide cases that the People must prove, either by direct or circumstantial evidence beyond a reasonable doubt, the fact of death, the criminal agency of another as the cause of death, and the identity of the accused as that other. *Tate v. People,* 125 Colo. 527, 247 P.2d 665; *Downey v. People,* 121 Colo. 307, 215 P.2d 892; *Brown v. People,* 116 Colo. 93, 178 P.2d 948; *Lowe v. People,* 76 Colo. 603, 234 P. 169; *Ausmus and Moon v. People,* 47 Colo. 167, 107 P. 204. In our view, in the present case proof of the second and third elements was insufficient to sustain the verdict of guilt of second-degree murder. The evidence, viewed in the light most favorable to the People, fails to establish that the death was caused by felonious means through the criminal agency of another, or, let alone, by the criminal agency of the appellant. The People's undisputed medical testimony indicates that the death could have been caused equally by accident or by a felonious act. In view of this evidence, the inference of guilt beyond a reasonable doubt cannot rationally be drawn. *Cf. Tate v. People, supra.*

In addition to the basic inference of death by felonious means, the evidence must have been sufficient to support a second inference, that either the appellant was the felonious actor, or that he was an accessory. If he was an accessory, the

proof had to show that he was present and aware that his wife, Antonia, intended to commit the crime, and that he aided, abetted, assisted, advised or encouraged her in committing it. *People v. Marques,* 184 Colo. 262, 520 P.2d 113; *Dressel v. People,* 178 Colo. 115, 495 P.2d 544; *Vigil v. People,* 174 Colo. 164, 482 P.2d 983. The latter inference might have been warranted under the totality of the circumstances of the case, as urged by the People, were it not for the invalidity of the underlying inference — that the death was not occasioned by an accident, but rather was caused by a felonious act (which we heretofore have found to be unsupported by proof beyond a reasonable doubt). *Tate v. People, supra; Elliott v. People,* 115 Colo. 382, 174 P.2d 500. To permit a verdict of guilt to stand on such proof would be to sanction speculative verdicts based on suspicion, surmise, and conjecture. The standard of proof beyond a reasonable doubt demands more.

We are not oblivious to the grievous problems posed in dealing with battered child cases. *See R. Helfer and C. Kempe, The Battered Child* (1973). Our fundamental principles of criminal justice, however, should not be compromised to uphold convictions in such cases out of compassion alone when a dispassionate application of the law requires a different result.

Finding the proof insufficient to support the conviction of second-degree murder, the judgment must be reversed and the verdict set aside.

## II.

We consider the evidence in support of the convictions of mayhem and of assault with a deadly weapon to be ample to sustain the convictions on these counts. The quality of the proof in this regard was substantial even though circumstantial.

The medical evidence concerning the mayhem was that the intensive and severe burns were not accidentally incurred. This conclusion was supported by the nature and extent of the injuries. While Antonia had evidenced an intent to burn the child with scalding water to compel obedience, and admitted to burning his feet with scalding water, the

investigating officer's description of the physical evidence of the size and shape of the potbelly stove as compared with the size of the child, when considered in light of the size of the burns — 6-1/2 inches in length by 1-1/2 inches in width — justified a reasonable inference that the leg burn was deliberately inflicted. The pictures of these wounds as exhibited to the jury also justified the reasonable inference that the burns resulted in disfigurement of the leg, a necessary element of proof under C.R.S. 1963, 40-2-24. Appellant's failure to seek medical aid in this respect and his attempt to treat the burns himself, his false statement as to the time when they were incurred, and his implausible explanation as to the cause of the burns justified the jury in reasonably concluding that he was guilty, either as a principal or accessory, in the commission of this offense.

As to the assault with a deadly weapon, Antonia's admission that she used the whip-like electric cord on the boy, as shown by the variety of old and new bruises, contusions and abrasions over most of the child's body; the likewise implausible explanation that these injuries were caused by falling into the abandoned wells; appellant's expressed concern and fear to Servando Villanueva that someone might notice the marks on the boy's body; and appellant's attempt at concealment of the conditions, when considered together, all point to the inescapable inference that he was callously indifferent to the child's welfare and was guilty of the assaults which occurred over an extended period of time, if not as a principal then as an accessory, as was the prosecution's theory. Appellant's contention that there was no evidence to show that the injuries were inflicted for other than proper disciplinary reasons is frivolous. This position was never advanced to the attending physician or to the investigating authorities. The abuse inflicted on this child, if it was imposed for disciplinary purposes, transcended all bounds of reasonableness. *B. Steele and C. Pollock, Psychiatric Study of Parents Who Abuse Infants and Small Children,* in The Battered Child 103 (1973).

We find the evidence to be sufficient to support the jury's verdicts as to mayhem and assault with a deadly weapon.

## III.

■ Appellant contends that reversible error was committed by the trial court when it refused to give his tendered instruction on circumstantial evidence, which included the proposition that the evidence must be·consistent with the guilt and inconsistent with any reasonable hypothesis of innocence. We criticized the tendered instruction as outmoded and confusing in *People v. Bennett,* 183 Colo. 125, 515 P.2d 466. Moreover, in *People v. Calise,* 179 Colo. 162, 498 P.2d 1154, we held that failure to give the instruction in trials predating *Calise* would not constitute reversible error. This trial predated *Calise.* Accordingly, we find no merit to this argument.

## IV.

■ Finally, appellant contends that the trial court erred in admitting into evidence photographs of the body of the deceased child. The photographs accurately depicted the burns and the bruises, contusions and abrasions on the child's body. They were relevant and had probative value concerning the nature and permanency of the injuries inflicted upon the child. We find no abuse of discretion in the court's admission of the photographs into evidence. *People v. Lowe,* 184 Colo. 182, 519 P.2d 344; *People v. Jones,* 184 Colo. 96, 518 P.2d 819.

The judgments of conviction of mayhem and assault with a deadly weapon are affirmed and the sentences thereon stand. The judgment of conviction of second-degree murder is reversed and the cause remanded with directions to vacate the judgment and to dismiss the charge of second-degree murder.

MR. CHIEF JUSTICE PRINGLE concurs in part and dissents in part.

MR. JUSTICE ERICKSON does not participate.

MR. CHIEF JUSTICE PRINGLE concurring in part and dissenting in part:

I concur with the majority that the convictions for mayhem and assault with a deadly weapon should stand. I

dissent from that part of the majority opinion which reverses the conviction of second-degree murder.

In my view, the inferences which the jury was entitled to draw from the evidence with respect to mayhem and assault could also reasonably be drawn from the evidence on the issue of second-degree murder sufficient to support the conviction there.