No. 18,058.

JOHN GILBERT GRAHAM v. PEOPLE OF THE STATE OF COLORADO.

(302 P. [2d] 737)

Decided October 22, 1956.

Mr. CHARLES S. VIGIL, Mr. L. PAUL WEADICK, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, Mr. GREGORY A. MUELLER, Special Assistant Attorney General, for the defendant in error.

*En Banc.*

MR. CHIEF JUSTICE ALTER delivered the opinion of the Court.

JOHN. GILBERT GRAHAM was charged with the murder of his. mother, Daisie E. King. Upon trial to a jury a

verdict was rendered finding him guilty of murder in the first degree and fixing the penalty at death. Sentence was pronounced in accordance with the jury's verdict, and defendant is here by writ of error seeking a reversal.

The information herein was filed on November 15, 1955, and thereafter defendant filed a petition praying that doctors, psychiatrists and specialists be appointed to examine and treat defendant as his personal physicians, psychiatrists and specialists. Further therein he asked the court to find him to be an indigent person, and, so finding, appoint counsel to defend him.

At the same time defendant filed his motion to quash the information because not verified by one who had personal knowledge. On the same date defendant filed his motion for the dismissal of the information upon the grounds that the information did not state sufficient facts, that the court had no jurisdiction, and improper venue. All of said motions were denied by Judge Edward J. Keating, the District Judge then presiding in the Criminal Division of the District Court in which said information was filed.

Defendant, on arraignment and after the denial of the motions heretofore specified, entered a plea of not guilty and not guilty by reason of insanity "at the time, since and now." Whereupon the court ordered defendant committed to the Psychopathic Ward of the Colorado Psychopathic Hospital for a period of not to exceed thirty days for observation and report.

Following defendant's plea above mentioned, defendant filed a motion in which he objected to any other judge of the district court of the Second Judicial District hearing and trying him on the information, contending therein that a judge other than Judge Keating hearing and trying the case amounted to a "change of venue," and concluded his motion with the prayer, "Wherefore, defendant asks that the venue lie and remain in The Honorable Edward J. Keating, District Judge, and that

defendant objects to and states that it is improper for him to be given an involuntary change of venue." This motion was denied. Thereafter an order was entered appointing Drs. Leo V. Tepley and Norbert L. Shere as psychiatrists to examine defendant and cooperate with him and his counsel and to make certain laboratory and medical facilities available to said psychiatrists, which motion was granted.

Defendant's motion demanding a separate trial on the issue of insanity was filed and granted.

Six psychiatrists, in separate reports to the court, each found from their examination that the defendant was sane before, at the time of and subsequent to the date of the commission of the alleged offense. Whereupon defendant individually petitioned the court for permission to withdraw his plea of not guilty by reason of insanity and that the trial be had on his plea of not guilty alone, which petition was granted. Thereafter, and on March 1, 1956, defendant filed his "Waiver of Jury Trial" stating therein as a reason therefor, "I feel that I can obtain a fair and proper trial before the Honorable Joseph M. McDonald, Judge of the District Court." This motion was denied and the trial held before the Hon. Joseph M. McDonald and a jury.

The record consists of more than 2800 folios; more than 70 witnesses were examined, and more than 175 exhibits were offered and admitted.

The record discloses that defendant knew that some time prior to November 1, 1955, Daisie E. King contemplated a trip to Alaska to visit her daughter and had reserved space on a United Air Line plane scheduled for departure from Denver at 6:30 P.M. on November 1, 1955. The plane was delayed in its departure until 6:44 P.M., and a short time thereafter, and when the plane had reached a point about forty miles northerly from Denver, a terrific explosion occurred, completely wrecking the plane and resulting in the death of Daisie E. King and forty-three other persons.

The uncontradicted evidence is that the plane was in first class mechanical condition and that the explosive force originated in Pit 4 of said plane, in which pit all the luggage of Daisie E. King had been loaded. Agents of the Federal Bureau of Investigation were called to investigate the disaster and ascertain, if possible, the cause of the explosion and the persons responsible therefor. Under direction of the agent in charge, all recoverable portions of the wrecked plane were collected and transported to Denver, where they were separately stored and securely guarded. Dr. J. William Magee, Assistant Chief of Physicists, Chemistry Division of the FBI Laboratory at Washington, D.C., selected therefrom such exhibits as he deemed necessary for minute examination and analysis to determine the chemical contents of certain foreign substances adhering to the selected exhibits. From his examination and scientific analysis of these selected exhibits, Dr. Magee determined, and at the trial testified, that the foreign substance adhering to the several exhibits resulted from the explosion of dynamite. One of the numerous exhibits examined and analyzed by Dr. Magee was identified by him as part of a six volt Eveready Hot Shot battery. He further testified that the foreign substance adhering to the exhibits which he examined and analyzed were such as would be produced by the explosion of dynamite manufactured by the DuPont Company. The uncontested testimony was that the only dry cell batteries ever used in United Air Line planes are emergency equipment, and these are one and a half volt single dry cell batteries, not herein identified as to trademark.

William C. Mentzer, General Manager of Engineering at United Air Lines, after examining parts of the wrecked airplane and having the same reestablished in a "mock-up" form, gave his opinion, based upon the structural damage and the distribution of the wreckage at the scene of the tragedy, that the cause of the destruction of the plane was an explosion, the center of which

was in Pit 4, where, as we have said, all of Mrs. King's baggage was loaded.

The record discloses that at about 5 o'clock P.M., on November 1, 1955, it was arranged between Mrs. King and defendant that she would take defendant's wife and minor child with her to the Denver Motor Hotel, where her automobile was to be stored during her visit to Alaska, and the defendant should follow in his automobile, bringing Mrs. King's baggage with him, meeting her and her party at the Motor Hotel and then take them in his automobile to the airport. Upon arriving at the airport, defendant discharged the others at the entrance and proceeded to park his automobile. He carried Mrs. King's luggage to the weighing platform, where it was found to be overweight. Mrs. King directed defendant and his wife to apply for three trip insurance policies, one thereof to himself, another to her daughter, and another to her sister. The record discloses that one of the applications was not signed by Mrs. King, there was no recorded payment for two others, and one, in the sum of $37,500.00, with defendant named as beneficiary therein, apparently was the only valid application recorded, for which a policy was issued.

The uncontradicted evidence is that at about 12:30 P.M., on November 13, 1955, defendant and his wife, at the request of the FBI agents, arrived at the FBI offices for the purpose of ascertaining whether certain remnants of luggage recovered from the wrecked plane was that belonging to Mrs. Daisie E. King. After having identified certain of the luggage as being similar to Mrs. King's, Mrs. Graham departed. Graham was asked to remain for a further interview, and he said that he was more than willing to stay at the FBI office and help in any way that he could.

During this investigation defendant was asked about some ammunition which he had said was taken by his mother with her to Alaska for the purpose of engaging in a hunt with his half sister. He stated that the night

before Mrs. King's departure he had taken to her room a cardboard box filled with rifle and shotgun shells and 500 rounds of 22 caliber ammunition. Defendant stated that after Mrs. King's departure he had unsuccessfully attempted to find the ammunition in her room in his house, and, therefore, concluded that she had taken all of it with her in her baggage.

During this interview defendant was asked with reference to an Exacto set which he had contemplated purchasing for his mother as a Christmas present, and he stated that after having discussed it with his mother and finding that the set was not such as she would require in furtherance of her hobby of polishing seashells, he did not purchase the set and had so advised his wife. During the interview, and about 3:30 P.M., defendant was advised by the FBI agents that certain statements which he had made to them were not in accordance with certain facts which they had discovered in their independent investigation, and being anxious to straighten these variances out, asked him if he could remain with them until this was done. He stated again that he was perfectly willing to help in any possible way. Thereupon defendant, with two of the FBI agents, went to lunch, returning about 4:45 P.M., when the interview was continued.

Defendant was then asked concerning his background and activities, and this was the subject of the interview until about 6:30 P.M., when Mr. Moore, Assistant Special Agent in charge of the FBI office in Denver, Colorado, informed defendant that he was a suspect in having caused the explosion of the airplane on which Mrs. King was a passenger and advised defendant: "he did not have to answer any questions that whatever he said could be used against him in a court of law. I told him he could call an attorney of his own choosing before he answered any questions. I told him that the door of the interview room would remain open, that he was privileged to walk out of the interview room and out of our

office any time he felt that the questions were not to his liking, or that he shouldn't answer them. I told him we would not threaten him, that we were not going to make any promises, and that we felt as of this time that he was instrumental in the crash of Flight 629. I told him that any time he cared to go to the men's room, if he wanted anything to eat or drink, he had only to request it." Mr. Moore also advised him that he could use the telephone in the office if he desired to do so.

Immediately thereafter, at the request of the FBI agents, defendant gave them written permission to search his truck, his automobile, his residence, his tool box at the Hertz Garage, where he was employed, and the buildings on the Daisie E. King ranch near Toponas, Colorado, and to remove from the premises any letters, papers, materials or other property which they might require in their investigation, and likewise gave the FBI agents signed written permission to conduct a polygraph test. In each of these written permissions there is a statement that defendant was informed of his constitutional rights respecting the searching of his premises and the taking of a polygraph test, and likewise the statement that the permission to search was voluntary and without threats or promises of any kind.

After the execution of these written consents to conduct searches and at about 7:30 P.M., defendant related in detail that while working in the Hertz Garage, and about October 1, 1955, some unknown man whom he knew only as Karl came to the Hertz Garage trying to sell a watch, and he had talked with him on that occasion. Later he purchased an Exacto tool set from Karl, paying therefor the sum of $10.00, and he then proceeded to make a graphic description of the contents of the Exacto set. He gave a description of Karl from whom the purchase had been made, and shortly prior to November 1, 1955, advised his wife of this purchase for his mother's Christmas present. He later took the Exacto set to the drugstore to be wrapped as a Christmas pack-

age, and then placed it in the trunk of his car. Defendant stated that about 5 o'clock P.M., on November 1, he surreptitiously placed the Christmas box in his mother's suitcase, which had been packed for her contemplated trip, and that when he arrived at the airport with Mrs. King's luggage he then told his wife that he had placed the set in Mrs. King's luggage, although he had previously denied that he had related this information to his wife.

During the interview he said that while he and his wife and child were eating dinner at the Coffee Shop at the airport he became ill because he was concerned about his mother and the trip she was taking. His previous statement was that his illness was caused by food which he had eaten in the Coffee Shop.

At about 11:30 P.M., the FBI agents returned from a search of defendant's home, and defendant was advised that they had found there the $37,500.00 insurance policy which he had stated he had mailed to himself or lost by inadvertently throwing it into a trash can, and defendant was at this time informed that other statements which he had made were found to be incorrect. Both defendant and his wife were informed that, under the provisions of a federal statute, if either furnished a signed statement that contained false information, the FBI could, if necessary, present those facts to the United States District Attorney for his opinion as to whether the informant was purposely trying to mislead the FBI in the prosecution of their duties, and, if so, a charge for the violation of this statute might then be filed.

The agents had procured two written statements from defendant's wife with reference to the purchase of the Exacto set as a Christmas present for defendant's mother. In the first of these written statements she said that just before she and Mrs. King departed for the airport defendant stated that the Christmas present was in his car and that he wanted to put it in Mrs. King's luggage without her knowledge. Mrs. Graham having

been informed by the agents that defendant had positively stated that there was no Christmas present, thereupon stated, "Well, I have been lying to you. Jack told me not to tell you about the Christmas present." She thereupon said that she did not see the present which defendant had purchased nor did she see him put it, or any other thing, in Mrs. King's luggage. In a written addendum to her first written statement to the FBI, which was read to defendant, Mrs. Graham stated that after Mrs. King's departure on the plane she asked defendant if he got his mother's Christmas present in her luggage, and he answered affirmatively, and "He asked me not to tell any one about his obtaining this article because of his suspicion that it was stolen. At that time Jack again definitely indicated that he had placed such a package in the luggage of Mrs. King." Both of his wife's statements were read to defendant, and he identified her signature thereto as genuine.

At about the same time one of the FBI agents came into the interview room with some of the ammunition which defendant had stated was in Mrs. King's baggage, and confronted defendant with this evidence.

At about 12 o'clock another FBI agent returned to the interview room and related to defendant conversations with fellow employees at the Hertz Garage which were at complete variance with the statements which defendant had made with reference to the visits and his conversation with Karl. Whereupon defendant again stated that he had been lying to the FBI agents. He then related that his mother "had been raising hell" about the Crown A Drive-In, a business enterprise in which he and his mother were interested, and related his attempt to destroy it by disconnecting the gas pipes therein and causing an explosion which actually occurred. He also told about stalling his insured truck on the railroad tracks so that he collected the insurance. He said that he then wanted to tell the truth about his connection with the death of his mother.

Defendant stated that shortly after the earlier Medicine Bow Mountain plane crash Karl talked about the crash and stated that he had "the necessary stuff to blow up a plane." Defendant stated that he thereafter purchased 25 sticks of dynamite from Karl prior to November 14, 1955 (October 14) while defendant's mother was in Missouri. Defendant stated that Karl showed him how to make a bomb, and a small one was made and successfully tried out. Defendant then made a bomb which consisted of 25 sticks of dynamite, with two primer caps attached with two wires on each primer cap, the wire being yellow in color. He was unable to identify the manufacturer of the timer. In making the bomb he said he utilized a six volt Eveready Hot Shot battery, and he placed this bomb in Mrs. King's luggage which was taken with her on her trip, the timer being set for 90 minutes. This statement was made before defendant signed the written confession and after he had been warned of all of his constitutional rights and the purpose for which the statement might be used.

Defendant also stated that in purchasing the equipment for the bomb he paid Karl $38.50, specifying in the cost $20.00 for the timer, $14.00 for the dynamite, and two primer caps at about $1.50, and the remainder thereof being for the price of the battery. Defendant had informed Karl of his mother's contemplated trip to Alaska and his intention of using the bomb in connection with this trip, whereupon Karl suggested that he take out all of the trip insurance policies that he could obtain on his mother's life and that the insurance money was to be divided equally between them. Defendant stated that Karl threatened that if the bomb was not used for its planned purpose he would inform the police of defendant's plan.

Lyman P. Brown, who is in the mercantile business in Kremmling, Colorado, testified that so far as he could definitely fix the date defendant came to his establishment on the 22nd day of October, 1955, and purchased

either 20 or 25 sticks of DuPont 45% dynamite and two electric blasting caps, together with 16 feet of wires attached thereto.

Joseph Thomas Grande, an employee of the Royal Electric Supply Company in Denver, Colorado, testified that his employer was in the wholesale electrical supply business and did not sell to individuals. He identified defendant as a man who came into their store on the morning of October 17, stating that he was an employee of the Colorado-Texas Pump Company and was in Denver to buy a timing device for a 6 volt pump circuit. After examining a catalog they ordered by telegram a timer which defendant claimed he needed immediately, and on the 19th of the month the timer was received. It developed that the timer was not the one needed, and another telegram was sent to Hartford, Connecticut, ordering another timer. Mr. Graham called a number of times and came into the store to inquire whether the second timer had been delivered. When the receipt of the second timer had been delayed, Grande called defendant, and was told that the pump job was in Utah, and that he was being paid by his company for the time that he was required to remain in Denver, and, consequently, it occasioned no hardship on him. The witness suggested that the timer be sent to the nearest point in Utah by way of bus, but defendant insisted he would wait for it. The timer arrived on October 24, and the witness phoned the defendant at the address he had given, but was unable to contact him. On the 26th of October the second timer was delivered to defendant and a receipt for the payment thereof given him. On October 28 he returned the second timer and stated that he wanted the timer which had been delivered on October 19, which was then re-delivered to him.

The oral confession was completed at approximately 12:30 A.M., on November 14, 1955.

At the conclusion of the oral confession, a stenographer being present, the dictation of the written confes-

sion was begun, and at about 1:30 A.M. concluded. Shortly after the dictation of the written confession defendant was examined by a licensed physician, who testified that he was apparently in good physical and mental condition. The written confession was transcribed at about 2:30 A.M. and read, initialed and signed by defendant at about 3:30 A.M. He was informed by an FBI agent that he was under arrest charged with the violation of a federal statute, and thereafter defendant signed a statement requesting that he be permitted to remain in the FBI offices until the morning.

The written confession is as follows:

"November 14, 1955
JG                                    Denver, Colorado

"I, JOHN GILBERT GRAHAM, make the following voluntary statement to JAMES R. WAGONER, PAUL E. BUSH and BRENDAN P. WALSH, who have identified themselves to me as Special Agents of the Federal Bureau of Investigation, United States Department of Justice. I realize that I do not have to make any statement and that any statement that I do make can be used against me in a Court of Law. I have been advised I have a right to consult a lawyer at any time. No threats, promises or moneys have been offered to me to make this statement. I make this statement because I desire that the truth be known concerning this matter.

JG

"My name is JOHN GILBERT GRAHAM and I was born on January 23, 1932, in Denver, Colorado. I received a high school certificate from the University of Denver Extension Division in 1950 and have completed one year of college at the University of Denver.

JG

"I am the son of the late MRS. DAISIE E. KING, who was killed in the wreck of a United Airlines Plane on November 1, 1955, while enroute from Denver, Colorado, to Anchorage, Alaska.

JG

"On about October 18 or 19 I placed in the trunk of my 1951 Plymouth Sedan twenty-five sticks of dynamite, 40-60 per cent, a timing device, and an Everready six-volt dry cell Hotshot battery and two dynamite caps with about eight feet of wire attached to the caps. All of this was placed in a cardboard box about eighteen inches long and about eight inches wide and about six or eight inches deep. I covered this carton containing the above items with a blanket and left it in the trunk of my car until the afternoon of November 1, 1955. It was the day my mother, Mrs. Daisie E. King, was due to leave Denver on her proposed trip to Anchorage on United Airline Flight 629 scheduled to leave at 6:30 P.M.

JG

"On the afternoon of November 1, 1955, at about 5:15 P.M., my wife, GLORIA GRAHAM, and my mother, Mrs. DAISIE E. KING, with our son, ALLEN GRAHAM, age twenty months, left our residence at 2650 West Mississippi in my mother's 1955 Chevrolet enroute to the Denver Motor Hotel, 1420 Stout Street, for the purpose of placing my mother's car in storage until she returned from Alaska. I told my mother and my wife that I would place my mother's luggage in my automobile and meet them at the Denver Motor Hotel, from where we would all continue to the Denver Municipal Airport so that my mother could board the United Airlines Plane enroute to Alaska.

JG

"As soon as my mother, wife and son had left our residence, I went out to my car, which was parked in the driveway in front of my house and there in the trunk of my car I placed the twenty-five sticks of dynamite in a paper sack around the two dynamite caps. To each dynamite cap was attached two strands of wire approximately eight feet in length. I then wrapped about three or four feet of binding cord around the sack

of dynamite to hold the dynamite sticks in place around the caps, leaving the wires which were attached to the dynamite caps extending out of the paper sack. I then connected one of the wires from one of the caps to one of the battery poles, having run this wire through the timing device. I connected the other wire of this same cap directly to the other battery pole. I then connected the second cap in the same manner. The purpose of the two caps was in case one of the caps failed to function and ignite the dynamite. I then set the timer to detonate the dynamite in one and one-half hours, because that was the maximum time on the timer. At this time, an hour and one half, I knew that the circuit between the caps and the battery which was broken by the timer would be closed by the timer mechanism and detonate the caps, which would detonate the dynamite.

JG

"I then took this sack of dynamite with the battery and timer attached and placed it in my mother's large Samsonite suitcase, which she had previously packed to take with her on her trip to Alaska. I placed this suitcase in the trunk of my car, together with another smaller suitcase and a brief case, which my mother had packed to take with her on her trip. I then drove to a surplus store on Alameda near Federal in Denver, where I purchased two olive-colored web straps. I then drove to the Denver Motor Hotel where I picked up my mother, wife and son. We then drove in my car to the Denver Municipal Airport. I let my mother, wife and son out of the car at the entrance to the main building at the Airport. I then parked my car at one of the parking meters about a half block from the main entrance to the Airport Terminal. I then took the two web straps which I had purchased and fastened them around the large suitcase in which I had placed the dynamite. I then took this suitcase, together with the one small suitcase and brief case, belonging to my mother, to the United Airlines Ticket Counter in the main Airport

Terminal Building, where I turned all the luggage over to my mother. My wife and I then waited at a point about thirty feet from the United Airlines counter while my mother checked her luggage onto United Airlines Flight 629.

JG

"After my mother had finished checking her luggage, my wife and I went with her to the passenger's gate where my wife and I told my mother goodbye and watched her board the plane with the other passengers. My wife and I then watched the United Airlines Plane taxi down the runway, after which we, with our small son, went into the coffee shop at the Airport and had dinner. We were in the coffee shop for approximately one hour and as we were leaving I heard the cashier of the coffee shop make the statement that there had been a wreck of an airplane about forty miles out of Denver. Later on that evening after my wife and I had returned to our home, we heard over the radio, and later verified by United Airlines personnel, that there had been an explosion on United Airlines Plane 629 that evening near Longmont, Colorado, and that all the passengers aboard had been killed.

"I have read the above statement consisting of this page and four others and it is all true, I have initialled the pages.

(signed) John Gilbert Graham

*Witnessed:*
James R. Wagoner, FBI, Denver, Colo. 11/14/55
Paule E. Bush, FBI, Denver, Colo. 11/14/55
Brendan P. Walsh, F.B.I., Denver, Colo. 11/14/55"

At the conclusion of the people's case defendant interposed his motion for a directed verdict and renewed his motion to dismiss, both of which motions were denied.

During the trial defendant filed in the district court his refusal to appear and testify as a witness and further objected to his wife or any psychiatrist testifying in his

behalf, whereupon defendant called eight witnesses, none of whom testified to any fact contradicting any evidence offered by the people. Thereupon defendant rested and no rebuttal evidence was offered. Defendant thereupon renewed his motion for a directed verdict and the motion to dismiss, both of which were denied.

Defendant tendered fifteen requested instructions, all of which were denied, whereupon the court gave to the jury twenty-three instructions, no objection to any one thereof having been made, and the case was submitted to the jury, which returned a verdict finding the defendant guilty of murder in the first degree and fixing the penalty at death.

The defendant filed his motion and amended motion for a new trial, setting forth thirty-six alleged errors, which motion was denied and sentence imposed. Defendant is here by writ of error and urges nineteen alleged errors which he contends justify a reversal of the sentence pronounced herein.

In the "Summary of Argument and Grounds for Reversal" we find:

"Although the defendant, as indicated by the Record, has stated that he desires to waive his appeal, if the Supreme Court of the State of Colorado feels that a defendant can waive such an appeal, then, of course, there is nothing further to argue, since the matter can be determined on that issue alone, but there are many points that could justify reversal."

An examination of the record and the reporter's transcript herein contains no evidence of a sufficient request made by defendant waiving his writ of error or any intimation thereof, and until such a proper and legal request by a convicted defendant appears in the record, properly certified to this court, we decline to consider and determine the question.

1. Prior to defendant's arraignment, a motion to quash the information was filed based on the ground that the person making the affidavit supporting the

information had no personal knowledge of the commission of the offense. This motion was properly denied. *Holt v. People,* 23 Colo. 1, 45 Pac. 374; *Bergdahl v. People,* 27 Colo. 302, 61 Pac. 228; *Wickham v. People,* 41 Colo. 345, 93 Pac. 478; *Brock v. People,* 98 Colo. 225, 54 P. (2d) 892.

2. As we have said, all preliminary motions and the arraignment of defendant were before Judge Edward J. Keating, then presiding over one of the criminal divisions of the district court, and defendant objected to the trial being held before Judge Joseph M. McDonald, who, under the rules of the district court of the Second Judicial District, was then the presiding judge in the criminal division in which all motions and the arraignment had been ruled upon and plea taken. Defendant's contention here is that this amounted to a "change of venue." In this counsel is mistaken. The venue remained the same throughout the entire proceeding, and, furthermore, the record discloses that in defendant's motion waiving his trial by jury he therein alleged, "I feel that I can obtain a fair and proper trial before the Hon. Joseph M. McDonald, Judge of the District Court." There is not a scintilla of evidence in the record disqualifying Judge McDonald, and the case regularly appearing upon his docket, the trial was properly held in the court where he presided as judge.

3. Error is assigned in denying defendant's motion to waive a trial by jury. Our statute, C.R.S. '53, 40-2-3, provides: "* * * The jury before which any person indicted for murder shall be tried, shall, if it find such person guilty thereof, designate by its verdict whether it be murder of the first or second degree, and if murder of the first degree, the jury shall in its verdict fix the penalty to be suffered by the person so convicted, either at imprisonment for life at hard labor in the penitentiary, or at death; and the court shall thereupon give sentence accordingly.

"* * * If any person indicted for murder shall plead

guilty to the indictment, the court shall thereupon im-
panel a jury as in other cases, to which shall be sub-
mitted, as the sole issue in the case, the question whether
the killing was murder of the first or second degree.
The jury in every such case shall find the degree thereof,
and, if murder in the first degree, shall fix the penalty
at death or imprisonment for life, and the court shall
thereupon give sentence accordingly; * * *."

Defendant in his argument contending that he
had a right to waive his trial by jury and have it held
before the judge of the court alone, calls attention to the
court's decision in *Munsell v. People,* 122 Colo. 420, 222
P. (2d) 615, wherein defendant, charged with a felony
other than murder, had waived his jury trial and was
tried by the judge of the court on his plea of not guilty
and found to be guilty and sentenced to the penitentiary.
We therein affirmed the judgment, and in the opinion
stated that, "nothing herein shall be construed as coun-
tenancing the waiver of a jury where the charge is
murder of the first degree." Counsel for defendant
contend that this quoted portion of the Munsell-People
opinion, supra, is dictum. Conceding the correctness of
counsel's position, we now definitely announce that in a
trial for murder the mandatory provisions of the statute
require a jury empowered to fix the degree of murder,
and if determined to be murder of the first degree, to fix
the penalty to be suffered by the defendant, and the
trial judge has no duty other than to impose a sentence
in accordance with the verdict.

4. The evidence discloses that any offense committed
by defendant was in the City and County of Denver,
where the trial occurred. It is undisputed that the death
occurred in Weld County, Colorado. It is, therefore,
contended by defendant that the district court of the
City and County of Denver was without jurisdiction to
try him for the alleged offense.

Our statute, C.R.S. '53, 39-9-1, provides:

"When an offense shall be committed on a county line, the trial may be held in either county divided by such line. Where any offense shall be committed against the person of another, and the person committing the offense shall be in one county, and the person receiving the injury shall be in another county, the trial may be held in either county."

Our statute, C.R.S. '53, 40-2-12, provides:

"If the injury be inflicted in one county and the party die within another county or without the state the accused shall be tried in the county *where the cause of death was administered.* And if the party killing shall be in one county and the party killed be in another county at the time the cause of death shall be administered, *the accused may be tried in either county.*" (Italics ours.)

The "cause of death" was administered in the City and County of Denver when defendant, according to the evidence, caused the bomb to be placed in the airplane and out of his custody and beyond his control, with the intent and for the purpose of causing the death of his mother who was a passenger on the plane. Her death was undoubtedly the result of defendant's unlawful act, and this having occurred in the City and County of Denver, the venue was there properly laid pursuant to the statute, and the trial court unquestionably had jurisdiction. *See Haddock v. People,* 117 Colo. 416, 188 P. (2d) 891.

5. As we construe another of defendant's assignments, error is alleged in the admission of the oral and written confessions of defendant. The uncontradicted evidence in the record discloses that defendant's constitutional rights, both federal and state, were carefully safeguarded throughout the investigatory proceedings as well as the subsequent trial. It is true that in his oral confession defendant made statements admitting his participation in crimes other than that charged in the in-

formation upon which he was tried and in relating these confessions all thereof was before the jury. We have uniformly held that where a statement made by a defendant in a criminal case is admissible in evidence, either as an admission or declaration; it is admissible as an entire statement, including that which is favorable as well as unfavorable to the party making the same, and where such statements are freely made, they are admissible against a defendant even though at the time of making the statement he was under arrest and charged with an offense. *McRae v. People,* 131 Colo. 305, 281 P. (2d) 153. Defendant, in his written confession, definitely admits that the confession was made after he had been warned of his every constitutional right respecting confessions and the use that could be made thereof, and the undisputed evidence is that before any oral statement was made by defendant respecting his participation in the crime with which he was charged he was likewise warned of all of his constitutional rights. Under the evidence here, the written and oral confessions in their entirety were admissible in evidence.

6. It is further contended by defendant that there was no direct evidence warranting the trial court in giving an instruction on first degree murder although it is to be noted that no objection whatever was interposed by defendant to this instruction which might justify our disregarding it.

Both the oral and written confessions we have held to be *direct evidence justifying the submission of a first degree murder instruction. Mitchell v. People,* 76 Colo. 346, 232 Pac. 685; *Ives v. People,* 86 Colo. 141, 278 Pac. 792; *Downey v. People,* 121 Colo. 307, 215 P. (2d) 892.

7. Error is assigned on the refusal of the court to give defendant's fifteen tendered instructions. The only argument with reference thereto presented is, "These points are self-explanatory for the most part, and we do not feel that anything could be gained by

going into the various instructions and showing how they were applicable to the case, but we do feel that each and every instruction was applicable and should have been given, and failure to give was prejudicial to the defendant."

Notwithstanding this rather short and unusual method of attempting to shift to the court the responsibility of considering fifteen instructions, we have, nevertheless, studied and considered each thereof. One of the requested instructions was on first degree murder. Such an instruction in proper form was given the jury. Every instruction tendered, applicable to the issue, was embodied in an instruction given by the court; only those wholly inapplicable were refused. The court did submit instructions on murder in the first and second degree and submitted three forms of verdicts, one finding defendant guilty of murder in the first degree; one finding defendant guilty of murder in the second degree; one finding defendant not guilty. Under the undisputed and wholly uncontradicted evidence in the case, these were the only verdicts possible for the jury's consideration.

Assuming the truthfulness of defendant's statements with reference to his association with the absent Karl and Karl's suggestions, plans and participation in the diabolical scheme and plot to enrich themselves by the destruction of the plane on which defendant's mother was to be a passenger would in no wise exculpate defendant. If these statements were true, provable, and Karl was apprehended, tried and found guilty, our statutes provided the penalty.

The record discloses a planned and considered diabolical scheme, successfully executed by defendant, which resulted in the death not only of his own mother but more than two score other passengers on the plane which was so completely wrecked. Defendant was represented at the trial by three court-appointed attorneys who throughout the entire trial were diligent in protect-

ing and safeguarding defendant's every right. Defendant's trial was held before a fair and impartial judge and a fair and impartial jury, selected after a most careful voire dire examination. Defendant offered no evidence whatever to refute any material evidence produced by the people in the prosecution of the case. We observe that the record discloses the meticulous care and scientific approach used by the FBI agents in investigating the tragedy and assembling the evidence which resulted in the conviction of defendant. The FBI agents were ably assisted by local officers as well as the investigators of the office of the Denver District Attorney. The District Attorney and members of his staff had thoroughly familiarized themselves with the evidence and presented all thereof in a fair and impartial manner.

We have painstakingly examined and studied the entire record in this case, and from it we are impelled to the conclusion that the verdict of the jury was based not upon conflicting evidence but upon uncontradicted, competent testimony; properly admitted exhibits, and the confessions, oral and written, of the defendant. No other verdict than guilty of murder in the first degree could have been returned with due regard to the evidence before the jury, and defendant must suffer the penalty provided by law, he having been accorded every constitutional guaranty. Nowhere in the reports of criminal cases have we found a counterpart to this case, and we doubt if anything approaching it can be found in fiction.

Finding no error in the record, the judgment is affirmed and it is ordered that the sentence be executed during the week ending January 12, 1957.

Mr. JUSTICE MOORE specially concuring would dismiss the writ of error.

I am of the opinion that the writ of error in this case should heretofore have been dismissed, and that it should now be dismissed for the reason that the record and documents on file with the clerk of this Court affir-

matively and conclusively show that plaintiff in error has not authorized any proceedings in this Court to review the judgment entered against him, but, on the contrary, has protested against the action of counsel in causing writ of error to issue, and has on two separate occasions demanded in writing that the proceedings in this Court be stopped and the judgment of the district court be permitted to stand.

Plaintiff in error on May 24, 1956, addressed a signed letter in his own handwriting to "The Honorable Justices Colorado Supreme Court." In this letter he says in part:

"It has been brought to my attention, that my attorneys, namely, Charles Vigil, Paul Wedick, John J. Gibbons, are going to appeal my recent conviction, this being done, over my expressed wishes that it not be done. * * * I'm sure that you'll appreciate the fact that I'm the interested party herein concerned, and that my wishes should be given some consideration. I have no desire to appeal this conviction. * * * If any appeal is made, it will be made wholly without my consent, and I will have no part in it. * * *

"I hope after reading the above, you will accept absolutely no appeal, from anyone in my behalf as I'm now the only one who has any right to do this." July 21, 1956, these statements were repeated in an appeal to the Governor. Each of these letters is on file in the office of the Clerk of this Court.

If a document had been filed, which was prepared in formal legal language, typewritten on legal sized bond paper, bound with a colored cover, and preceded by the caption of the case, "John Gilbert Graham, Plaintiff in Error, vs. The People of the State of Colorado, Defendant in Error," and which read something like the following:

"Comes now John Gilbert Graham in his own proper person and moves the court to forthwith dismiss the writ of error heretofore issued herein for the reason and upon the ground that he has not authorized any person to

prosecute a writ of error on his behalf, and that said writ of error has been sued out over his express direction that no such action be taken, * * *" I am sure that an "examination of the record and the reporter's transcript herein" would have disclosed evidence of a sufficient request made by defendant waiving his writ of error, upon which this Court could logically take no action other than to grant the motion.

The record in this case consists of all that has been filed in this Court as well as that which took place in the trial court. I am at a loss to understand how one confined in the penitentiary can file a proper and legal request to disregard what attorneys may do without authority if the request of Graham, which belongs in the record of the case, does not have that effect.

I sincerely believe that we embark upon an uncharted course when we take jurisdiction of this case under these circumstances. If, however, there is reason to entertain the action on the merits, and the majority of the Court so holds, I am in agreement that the judgment should be affirmed.